[No. B094456. Second Dist., Div. Three. Aug. 14, 1996.]

ALFRED F. BOCTOR, Plaintiff and Appellant, v.
LOS ANGELES COUNTY METROPOLITAN TRANSIT AUTHORITY
et al., Defendants and Respondents.

562

**COUNSEL**

Ronald P. Kaplan for Plaintiff and Appellant.

De Witt W. Clinton, County Counsel, and Cassandra G. Langston, Assistant County Counsel, for Defendants and Respondents.

**OPINION**

**ALDRICH, J.**—Plaintiff and appellant, Alfred F. Boctor, appeals from the judgment of the superior court denying his petition for writ of mandate to compel the chief executive officer (CEO) of the Los Angeles County Metropolitan Transit Authority (MTA) to vacate his decision demoting Boctor from his position as a manager of vehicle operations to bus operator. (Code Civ. Proc., § 1094.5.)

Boctor's contentions the MTA's CEO lacked the authority to reject the hearing officer's findings and recommendations, and the CEO's final opinion failed to meet jurisdictional procedural requirements, are without merit. Also without merit is his assertion the trial court committed prejudicial error by applying an improper standard when reviewing the MTA's decision. Our review of the record indicates the trial court properly and independently judged the evidence and found the MTA's findings to be supported by the weight of the evidence. Finally, we conclude the MTA's CEO properly exercised his discretion when he imposed a penalty more serious than that recommended by the hearing officer. Accordingly, the judgment is affirmed.

### FACTUAL AND PROCEDURAL BACKGROUND

On September 6, 1991, Boctor was employed as a vehicle operations manager for the Southern California Rapid Transit District.[1] During a meeting held that day, Louise Burnes, one of Boctor's subordinate employees, alleged Boctor had engaged in improper behavior by using profanity in the presence of bus drivers, subordinates and other employees, and by sexually harassing her. In particular, Burnes stated that on one occasion, in the presence of other employees, Boctor entered the room, greeted Burnes by kissing her on the hand, then told her, "You know, I woke up at 1:00 this morning wondering what you were doing." Boctor's comment made Burnes and the other employees very uncomfortable.

On another occasion, Boctor, Burnes and another employee, Fausto Brito, were out in the field at the corner of Pico Boulevard and Flower Street. When Burnes informed Boctor she was applying for a "senior position," Boctor replied, "Maybe Brito will be senior, but not you. . . . You have to go to lunch with me if you want to be a senior." When Burnes told Boctor she did not go out with persons she worked with, Boctor replied, "Do you think I'm too ugly? . . . What if I told you you'd be fired if you didn't go out with me?" A short time later, Boctor told Burnes the "measurements he liked," then asked Burnes to ask a blonde woman if she would go out with him.

At other times, Boctor had interfered with Burnes's work in the field and acted in an unprofessional manner to members of the public and bus patrons. During one incident, Boctor, addressing a member of the public, said, "The next time you see a Godamn [MTA] bus, you're not going to try to ma[ke] a right in front of it, huh?" On another occasion, when a bus patron approached Boctor with a complaint about the irregularity of service, he replied, "So what . . . . Why don't you catch the train?"

After listening to Burnes's allegations, Boctor rose to his feet, loudly interrupted her and stated, "I've been sitting here listening to this shit without saying a word! It's all bullshit! "When the acting assistant director of transportation, Daniel Ibarra, told Boctor to sit down, Boctor replied, "I'm sorry man, but I just can't sit here listening to this bullshit any longer! She's a damn liar! It's all bullshit!" When Burnes then became upset, rose to her feet and said, "You can't talk to me like that," Boctor told her to

---

[1]The agency's name has since been changed to the Los Angeles County Metropolitan Transit Authority. For purposes of clarity, the agency will be referred to as the "MTA" throughout this opinion.

"Shut up," took a step toward her and, while making a gesture toward her said, "My ass." Boctor then left the room.

In view of Burnes's allegations, Ibarra conducted further investigation. Ibarra interviewed Fausto Brito, who both Boctor and Burnes stated had witnessed the incident during which Boctor allegedly told Burnes she would not be promoted. Brito corroborated Burnes's statements and indicated Boctor had "said those things."

Ibarra also interviewed an employee, Willem Siedenburg, who Burnes stated witnessed Boctor kissing her on the hand. Siedenburg, however, denied any knowledge of the incident.

When Ibarra interviewed Clayton Flournoy, a supervisor who Boctor had indicated witnessed the incident during which he allegedly used vulgar language while speaking with a bus patron, Flournoy stated he had no knowledge of the incident and denied being present. Flournoy, however, indicated he had heard rumors of Boctor's "advances toward two other supervisors in the work group: Veray Smith and Cynthia Garrett."

Smith told Ibarra, although Boctor had not made sexual advances toward her, she had witnessed him using vulgar language on several occasions. On one such occasion, Boctor arrived at the scene of a traffic accident involving a bus and yelled out to several bystanders, "Get your motherfucking asses out of the street!" Smith indicated such conduct was "commonplace" for Boctor.

Cynthia Garrett, who had been recently appointed a supervisor, stated Boctor had, for a period of years, repeatedly harassed her sexually. Garrett indicated Boctor had repeatedly asked her out on "dates," and had invited her to his house to "go swimming" after indicating he and his wife had an "understanding." During another incident, Boctor offered Garrett a banana and, in a lewd manner, said, "I've got something for you. I want you to have this big, long banana."[2] When her polite refusals of Boctor's advances proved ineffective, Garrett decided to have nothing to do with Boctor and told him that she thought his "mouth [was] filthy." Garrett indicated that at times Boctor's conduct was so offensive she "dreaded coming to work." In addition, Garrett was convinced that when she applied for a senior position, Boctor, who helped grade the written portion of the relevant examinations, intentionally failed her in retaliation for her refusal of his advances.

---

[2] An assistant vehicle operations manager, Joseph Brown, who was present when the alleged incident occurred, agreed with Garrett's account of the events.

Ibarra also interviewed employee Frances Williams. Williams stated that on July 15, 1990, Boctor, while on assignment at the Pico passenger station, approached her and asked her to meet him at the Biltmore Hotel for a drink. Williams initially refused the invitation, but decided to accept when Boctor told her that he wished to discuss company business. At the bar, Boctor told Williams, "I want you to go to bed with me." At a later date, when Williams was considering applying for a senior position, Boctor told her, "I could probably help you with that." Williams declined Boctor's offer of help and he asked her to "reconsider." After Williams declined Boctor's repeated offers of assistance, he told her, "Don't be disappointed if you don't get it." Williams stated she believed Boctor's offers of help were actually offers to trade sexual favors for special consideration in the selection process, and that her failure to pass the written test could be attributed to Boctor's retaliation for her refusal of his advances. Although Williams had previously passed a written test of a "higher grade," she chose not to apply for a promotion during a later recruitment period because she feared Boctor's influence.

In a letter dated October 9, 1991, Ibarra informed Boctor of his findings and indicated a formal review of his conduct would be held on October 17, 1991. Ibarra stated the charges against Boctor were: "1. Conduct unbecoming a manager, and [¶] 2. Violation of the District's Sexual Harassment Policy." Finally, Ibarra informed Boctor the formal review procedure could result in "disciplinary action in the form of suspension, demotion, or discharge."

In a letter dated November 12, 1991, Ibarra informed Boctor that as a result of the hearings held on October 17 and 22, 1991, he was being demoted from his position as a vehicle operations manager to the position of bus operator. Ibarra indicated the action was being taken because Boctor had committed conduct unbecoming a manager and violated the MTA's sexual harassment policy. In support of this decision, Ibarra cited the evidence already reviewed, as well as some additional evidence. Ibarra noted testimony regarding an incident during which Boctor had invited a female employee, Hope Powell, to get into an elevator with him. When Powell refused, Boctor had called her a "chicken shit." On a different occasion, two male employees witnessed Boctor make what they considered to be an offensive comment to a female employee. After observing that the female employee was wearing a knee brace, Boctor addressed her and made a comment about "getting down on her knees."

Ibarra also referred to incidents he himself had witnessed. On one occasion, Ibarra saw Boctor approach a female employee from behind, then

give her a "bear hug" as she attempted to leave. When Boctor released the employee, she looked startled and embarrassed, then quickly left the room. Ibarra confronted Boctor about the impropriety of his behavior and Boctor replied, "You're just jealous because you don't have any sex appeal." On another occasion, Ibarra entered Boctor's office to find Boctor with another employee, Regina Sells. Boctor held up a sign with geometric letters on it and asked Ibarra to read them. After a moment, Ibarra realized the sign said, "Eat More Pussy." Before leaving the office, Sells shook her head and told Ibarra, "See what I have to put up with." When Ibarra told Boctor his behavior was not appropriate, Boctor simply stated Sells knew he was joking.

Ibarra noted Boctor had called a total of 29 character witnesses, 9 of whom testified. However Ibarra also noted that none of the witnesses called were familiar with the charges alleged or had been present at any of the alleged incidents. Under these circumstances, Ibarra concluded the witnesses' testimony "relating to [Boctor's] general character and deportment had no relevance [to] the specific charges . . . ." In addition, Ibarra recognized that at least one witness called by Boctor had objected to testifying. Employee Joan McCormack, who worked in the customer relations department, had contacted Ibarra to ensure that she would not be listed as a witness to testify in Boctor's favor. McCormack told Ibarra that Boctor had made repeated "advances" toward her, and that he "routinely made unwelcomed and improperly 'flirtatious and suggestive' comments." McCormack stated that on numerous occasions Boctor had asked her out for dates, and that on one occasion he asked her to accompany him on a trip to San Felipe.

Finally, Ibarra noted Boctor's own testimony was incredible. Ibarra found both Boctor's denials and his explanations of events implausible. Ibarra concluded Boctor had repeatedly engaged in conduct unbecoming a manager and in violation of the district's sexual harassment policy.

Boctor, pursuant to MTA policy, appealed Ibarra's decision by filing a formal "grievance." Evidentiary hearings, during which Boctor was represented by an attorney, were held on May 11, 17 and 21, and July 7, 1993, before hearing officer Sara Adler. After hearing the testimony of numerous witnesses, Adler, in a report dated December 13, 1993, addressed many of the specific instances alleged against Boctor. With regard to the September 6, 1991, meeting with Louise Burnes, Adler concluded Boctor's actions, although unprofessional, had not been "threatening." As to Boctor's use of vulgar language with employees and private citizens, Adler found the evidence of many of the incidents had not been specific as to place and time,

and that such evidence was not "worthy of any weight to support the charge[s]." Adler also concluded Boctor's use of vulgar language was mitigated in that it appeared he used it only in response to "conditions of personal and situational stress." Finally, Adler noted the MTA had no "policy" prohibiting the use of such language and, in the absence of such a policy, the use of profane or objectionable language did not constitute a disciplinable offense.

As to the charges of sexual harassment, Adler addressed Williams's allegation Boctor asked her to meet him for a drink at the Biltmore. Recognizing Williams testified she had met Boctor at the bar at approximately 9:45 in the evening, Adler noted a witness called by Boctor, Armando Caceres, testified that on the same evening he saw Boctor driving on the 60 Freeway "sometime" after 8:30 p.m. In addition, Ibarra testified that, on the same evening, Boctor had "signed out" from his work station at 10 p.m. Adler concluded that, in view of the conflicting evidence, Boctor "could not have been at the Biltmore bar [at the time] Williams [said] she was there with him."

In conclusion, Adler indicated the sexual harassment charges, which were the more serious allegations, were not supported by the evidence. Accordingly, Adler made the following recommendation: "The reduction of Alfred F. Boctor was without cause and . . . the discipline imposed should instead be a 30-day suspension combined with a requirement that Mr. Boctor attend appropriate workplace training classes."

On April 25, 1994, Franklin E. White, the CEO of the MTA, issued the MTA's final opinion and decision in Boctor's grievance proceeding. After reviewing the appropriate records, White rejected Adler's recommendation. White indicated he "assign[ed] different weight to the evidence presented at the hearing since [he] believe[d] that there were credibility problems with certain testimony due to [Boctor's] close relationship with or influential position over witnesses, that the hearing officer relied on the testimony of a witness who contradicted his previous testimony[3] and that [Boctor had shown] a continuous and uncorrected pattern in the workplace of not only sexual harassment, but also harassment based on sex discrimination." In addition, White indicated he was rejecting the hearing officer's opinion and

---

[3]With regard to Williams's allegation Boctor asked her to meet him for a drink at the Biltmore Hotel, at one point Armando Caceres testified he had seen Boctor on the freeway at approximately 8:30 p.m. On another occasion, Caceres stated he saw Boctor at approximately 10:30 p.m.

recommendation because ". . . they fail[ed] to sufficiently recognize: (1) that there are serious legal consequences for an employer if sexual harassment is allowed to continue in the workplace . . . (2) that sexual harassment is viewed from the perspective of a reasonable person of the same sex as the harassed employee . . . and (3) that the impact of separate incidents can satisfy the legal definition of an abusive working environment even if no single episode crosses the Title VII threshold . . . ."

On July 5, 1994, Boctor filed a petition for writ of mandate in the superior court pursuant to Code of Civil procedure section 1094.5, requesting the court to direct White and the MTA to set aside the April 25, 1994, decision, to adopt the hearing officer's recommendations, and to reinstate Boctor to his position of manager of vehicle operations. In a decision entered April 24, 1995, the trial court denied Boctor's petition. This appeal followed.

CONTENTIONS

Boctor contends: (1) the MTA's CEO lacked the authority to reject the hearing officer's findings and recommendations; (2) the CEO's final opinion is not binding because it failed to meet jurisdictional procedural requirements; (3) the trial court committed prejudicial error by applying the wrong standard when reviewing the MTA's decision; and, (4) the MTA's CEO abused his discretion when he imposed a penalty considerably more serious than that recommended by the hearing officer.

DISCUSSION

1. *The MTA's CEO acted within his proper authority when he rejected the hearing officer's findings and recommendations.*

■ Boctor contends White lacked the authority to reject the hearing officer's findings and decision. He urges MTA procedures regarding non-contract employees, governed by its human resources policy manual, are improper since the manual was unilaterally instituted by MTA (it does not embody a "bargained for" policy), and its provision allowing the CEO to reject the decision of its hearing officer allows the MTA to, in effect, appeal unfavorable rulings to itself. In support of his contention, Boctor cites *Cohan v. City of Thousand Oaks* (1994) 30 Cal.App.4th 547 [35 Cal.Rptr.2d 782].

In *Cohan, supra,* after a city planning commission approved a developer's proposed subdivision and development plan, the city council, acting as an entity, appealed the approval to itself. After a public hearing, which failed to meet requirements of procedural due process, the city council overruled the

planning commission's decision. The court determined the city council's decision was improper since the city council, acting as a body, acted in an "arbitrary and high-handed" manner when it appealed to itself to make sure the planning commission's decision did not go unchallenged. (30 Cal.App.4th at pp. 558-559.)[4]

Here, the MTA was not appealing the ruling of a subordinate agency to itself. Instead, the MTA simply followed the formal hearing procedures articulated in its human resources policy manual, which, with regard to the final disposition of a grievance proceeding, specifically states that "[t]he report of the . . . hearing officer is advisory only. After returning the report and recommendations, the General Manager [or chief executive officer] shall decide the case and shall notify the grievant in writing of his decision and the basis thereof."

In the present case, after the hearing officer made her findings and recommendations, her report was forwarded to the CEO for final disposition. The CEO was not required to adopt the hearing officer's findings. Moreover, as we explain more fully below, since the CEO's opinion is supported by the evidence, we cannot conclude he acted in an arbitrary or high-handed manner when he rejected the hearing officer's recommendation.

2. *The CEO's final opinion properly met jurisdictional and procedural requirements.*

■ Boctor contends the CEO's final opinion is not binding because it fails to meet jurisdictional procedural requirements set forth in Government Code section 11517. Boctor urges that, in filing his opinion the CEO failed to meet required time limits, and that the CEO failed to provide him the required opportunity to present additional oral or written argument before rejecting the hearing officer's recommendations.

Government Code section 11517, subdivision (d) provides that "[a] proposed decision shall be deemed adopted by [an] agency 100 days after delivery to the agency . . . unless within that time . . . the agency . . . commences proceedings to decide the case upon the record, . . . or . . . the agency refers the case to the administrative law judge to take additional

---

[4]The court noted, however, that its holding ". . . should not be read as invalidating all appeals taken by a city council or other governing body to itself from a decision of a subordinate agency." The court continued, "We *do* emphasize, however, that if such a procedure is contemplated, it should be authorized by ordinances or rules which govern appeals to such entity . . . ." (*Cohan* v. *City of Thousand Oaks, supra,* 30 Cal.App.4th at p. 559, original italics.)

evidence." Boctor urges, under the provisions of this section, the hearing officer's findings and recommendation, filed December 13, 1993, became final and binding since the CEO's final opinion was not filed until more than 100 days later, on April 25, 1994. In addition, Boctor urges the CEO's opinion is improper and not binding since the CEO failed to provide Boctor with the opportunity to present additional argument before rejecting the hearing officer's recommendation as required by Government Code section 11517, subdivision (c).[5]

Boctor's contentions fail. Government Code section 11500, subdivision (a) states the term "agency," as used in section 11517, "includes the state boards, commissions, and officers . . . to which this chapter is made applicable by law . . . ." Section 11501 lists numerous state agencies, but fails to list the MTA or any other municipal or local entity. In addition, nothing in the legislation enabling the MTA to operate indicates it is bound by Government Code section 11500 and its related provisions. (See Pub. Util. Code, §§ 130051.11, subd. (a), 130051.12, subd. (a), 130051.13, 130051.15; see also *Allen* v. *Humboldt County Board of Supervisors* (1963) 220 Cal.App.2d 877, 883 [34 Cal.Rptr. 232] [In general, the Administrative Procedure Act (Gov. Code, § 11500 et seq.) does not apply to local agencies.].) Under these circumstances, the provisions of section 11517 do not apply to Boctor's case.

In addition, we cannot conclude the MTA's procedures, which allow the CEO to reject the hearing officer's recommendation without providing the employee an additional opportunity to present oral or written argument, violate fundamental notions of due process. " ' "Due process requires a fair trial before an impartial tribunal and that requires that the person or body who decides the case must know the evidence [and the arguments], but due process is not interested in mere technical formalism. It is the substance that is determinative of whether" ' an administrative procedure affords due process. [Citation.] Accordingly, '. . . participation in a decision by a [CEO] who has read and considered the evidence, or a transcript thereof, even though he was not physically present when the evidence was produced, does not violate the requirements of due process.' [Citation.]" (*Bockover* v. *Perko* (1994) 28 Cal.App.4th 479, 487-488 [34 Cal.Rptr.2d 423].)

Nor does the alleged " 'advisory' nature of the hearing body's decision render the grievance procedure inadequate." (28 Cal.App.4th at p. 487.) The

[5]Subdivision (c) of section 11517 provides in relevant part: "If the proposed decision is not adopted . . . the agency itself may decide the case. . . . The agency itself shall decide no case . . . without affording the parties the opportunity to present either oral or written argument before the agency itself."

fact that the hearing officer's recommendation regarding Boctor was only advisory merely emphasizes the point that the CEO was not bound by the decision. In so holding, however, we must emphasize that while the CEO may properly reject the advisory decision of the hearing officer, this action must not be arbitrary or capricious. It may only be done after the grievant has been afforded adequate due process at the administrative hearing and then only if the decisionmaking tribunal, the CEO in this case, bases the rejection on a proper review of an appropriate record of the proceedings before the lower administrative tribunal.

In the present case, the hearing officer's recommendation was advisory only. Our review of the record indicates the CEO rejected the hearing officer's recommendation only after reviewing the appropriate record, which included both the evidence and arguments presented during the four days of evidentiary hearings and prior proceedings. Under these circumstances, we conclude the procedures provided were fair, and the MTA's refusal to afford Boctor the opportunity to present additional argument before the CEO did not deny him due process of law. (See *Bockover v. Perko, supra,* 28 Cal.App.4th at pp. 487-488.)

3. *Review of the record indicates the trial court applied the proper standard of review.*

*Court applied the weight of the evidence test.*

■ Boctor contends the trial court committed prejudicial error by reviewing the MTA's findings under the wrong standard. He urges the trial court improperly reviewed the MTA's findings under the "substantial evidence" test, when it should have considered whether they were supported by the "weight of the evidence."

"If [an] order or decision of [an] agency substantially affects a fundamental vested right, the trial court, in determining under section 1094.5 whether there has been an abuse of discretion because the findings are not supported by the evidence, must exercise its independent judgment on the evidence and find an abuse of discretion if the findings are not supported by the weight of the evidence. If, on the other hand, the order or decision does not substantially affect a fundamental vested right, the trial court's inquiry will be limited to a determination of whether or not the findings are supported by substantial evidence in the light of the whole record." (*Strumsky v. San Diego County Employees Retirement Assn.* (1974) 11 Cal.3d 28, 32 [112 Cal.Rptr. 805, 520 P.2d 29].) It has been previously held that "[d]iscipline imposed on [public] employees affects their fundamental vested right in their

employment." (*McMillen* v. *Civil Service Com.* (1992) 6 Cal.App.4th 125, 129 [8 Cal.Rptr.2d 548]; *Schmitt* v. *City of Rialto* (1985) 164 Cal.App.3d 494, 500 [210 Cal.Rptr. 788].) Accordingly, the superior court was required to exercise its independent judgment on the evidence and find an abuse of discretion if the MTA's findings of Boctor's misconduct were not supported by the weight of the evidence.

In its statement of decision, the trial court indicated "[a] principle controverted issue at the hearing on the petition was whether the court should apply the independent judgment test or the substantial evidence test. [¶] The court has determined that the proper standard of review in this case is the substantial evidence test. The record shows substantial evidence to uphold the administrative decision in this case." However, the court also stated that "[a] principal controverted issue at the hearing on the petition was whether [MTA's] decision of April 25, 1994 was supported by the weight of the evidence. The court has determined that findings made by respondent are supported by the weight of the evidence. The court has determined the following: [¶] a. Respondent's Finding No. 1 that petitioner conducted himself [in a manner] unbecoming to a manager is supported by the following evidence: [¶] On more than several occasions, petitioner, a senior manager, conducted himself in an unprofessional and inexcusable manner. These occasions included petitioner's using foul language, sexual banter and sexual innuendoes inappropriate to the workplace. [¶] b. Respondent's Finding No. 2 that petitioner sexually harassed subordinate employees is supported by the following evidence[:] [¶] Complaints of sexual harassment against petitioner were substantiated. There are specific instances where petitioner clearly created a hostile environment. Petitioner's demotion resulted after repeated warnings to conduct himself appropriately. [¶] Petitioner was aware of the MTA Sexual Harassment Policy."

Although there appears to have been some confusion on the part of the trial court, on this record we can conclude that in determining the MTA properly exercised its discretion in finding Boctor committed misconduct, the trial court independently judged the evidence and specifically found the MTA's findings to be supported by the weight of the evidence. The trial court's findings in this regard are specific and clear. Thus, the trial court's error in *stating* that the standard of review was that of substantial evidence was harmless. It is clear the trial court, for the purpose of these findings, *applied* the "weight of the evidence" standard.

*4. The MTA's CEO properly exercised his discretion in imposing a penalty more severe than that proposed by the hearing officer.*

■ Boctor asserts the MTA's CEO abused his discretion when he imposed punishment considerably more serious than that recommended by the hearing officer.

" '[T]he penalty imposed by an administrative body will not be disturbed in mandamus proceedings unless an abuse of discretion is demonstrated. [Citations.] Neither an appellate court nor a trial court is free to substitute its discretion for that of the administrative agency concerning the degree of punishment imposed. [Citation.]' [Citations.]" (*Schmitt* v. *City of Rialto*, *supra*, 164 Cal.App.3d at p. 500.) "Thus, as to the discipline imposed the standard of review on appeal remains the same as it was in the superior court: the administrative agency's exercise of discretion as to the discipline to be imposed will not be disturbed unless a manifest abuse of discretion is shown." (*Id.* at p. 501, citing *Barber* v. *State Personnel Bd.* (1976) 18 Cal.3d 395, 404 [134 Cal.Rptr. 206, 556 P.2d 306].)

Initially, Boctor claims his punishment is more severe than that afforded other MTA employees who have committed similar misconduct. He asserts other employees charged with unprofessional conduct and sexual harassment have been suspended for 30-day periods and ordered to attend counseling. However, Boctor has failed to provide evidence of the facts of these cases, other than to state that one of them involved "direct" physical contact. It is Boctor's burden to show that he received disparate, excessive punishment and, on the record presented, we cannot conclude he was treated more harshly than other, similarly situated, employees. (See *Huntington Park Redevelopment Agency* v. *Duncan* (1983) 142 Cal.App.3d 17, 25 [190 Cal.Rptr. 744].)

Boctor asserts the CEO, in rejecting the hearing officer's recommendation that he be suspended for 30 days, inappropriately considered the "serious legal consequences for an employer if sexual harassment is allowed to continue in the workplace." The assertion is without merit. The MTA ". . . did not act improperly in considering the potential legal liability of the [agency] for [Boctor's] acts or . . . possible future acts . . . . In determining whether a penalty imposed on a [public] employee is appropriate, the overriding consideration is the actual or potential harm to the public service. [Citation.] It was certainly appropriate for the [MTA] to consider the potential legal liability of the [agency] in assessing the actual or potential harm to the public service that might result from the future conduct of [Boctor] if

based on the same bad judgment as [he] demonstrated here." (*Schmitt* v. *City of Rialto*, *supra*, 164 Cal.App.3d at p. 503.)

5. *The trial court's findings are supported by substantial evidence.*

██ Boctor claims the trial court's findings are not supported by the evidence. As we stated above, ". . . the trial court was required to exercise its independent judgment and determine whether [the MTA's] findings were supported by the weight of the evidence . . . ." (*McMillen* v. *Civil Service Com.*, *supra*, 6 Cal.App.4th at p. 129.) On appeal, "we determine whether the trial court's findings are supported by substantial evidence on the whole record." (*Ibid.*, citing *Schmitt* v. *City of Rialto*, *supra*, 164 Cal.App.3d at p. 501.)

We have reviewed the record on appeal and find substantial evidence to support the trial court's finding Boctor conducted himself in a manner unbecoming to a manager. With regard to the finding Boctor sexually harassed subordinate employees the evidence substantially supports the trial court's finding Boctor's conduct amounted to, not mere occasional isolated incidents, but improper harassment of particular employees and the creation of a hostile work environment. (See *Fisher* v. *San Pedro Peninsula Hospital* (1989) 214 Cal.App.3d 590, 607-608 [262 Cal.Rptr. 842].)

DISPOSITION

The judgment is affirmed. Boctor to bear the costs of appeal.

Croskey, Acting P. J., and Recana, J.,* concurred.

---

*Judge of the Municipal Court for the Los Angeles Judicial District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.