[No. B129036. Second Dist., Div. One. Jan. 28, 2000.]

ROBERT DUNCAN, Plaintiff and Appellant, v.
DEPARTMENT OF PERSONNEL ADMINISTRATION et al., Defendants
and Respondents.

**[Opinion certified for partial publication.\*]**

*\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts A.2 and B.*

**COUNSEL**

Dennis F. Moss for Plaintiff and Appellant.

Howard Schwartz and Thomas W. Vallance for Defendants and Respondents Department of Personnel Administration and Department of Insurance.

Bill Lockyer, Attorney General, David S. Chaney and W. Dean Freeman, Deputy Attorneys General, for Defendants and Respondents Department of Insurance and Insurance Commissioner.

## OPINION

**MASTERSON, J.**—This appeal presents the principal question of whether the due process clause entitles a public employee to a predeprivation hearing before he is demoted in lieu of layoff. We conclude that such a hearing is not required and that a postdemotion hearing is sufficient.

### BACKGROUND

On March 12, 1990, plaintiff Robert Duncan went to work for the California Department of Insurance (DOI) in Los Angeles as an associate life actuary. After completing his probationary period, Duncan became a permanent civil service employee. His primary responsibility was to ensure that the premiums charged by health insurance carriers were within the limits allowed under state insurance laws. Duncan also reviewed legislation and handled consumer complaints.

In an August 1996 "Special Report" to employees, the DOI discussed the "current financial crisis [facing us]." The report explained that the crisis was due in part to lawsuits that had successfully challenged the DOI's imposition of certain fees and assessments on insurers. In addition, the Legislature had put a cap on the revenue the DOI could raise through fees. (See Stats. 1996, ch. 187, § 3.) The Legislature had also reduced the DOI's proposed budget by $2 million. (See Budget Act of 1996, Stats. 1996, ch. 162, item 0845-001-0217, provision 8.) The DOI report included a bar chart that depicted the budget for the 1996-1997 fiscal year, showing that expenditures exceeded revenue by $4.2 million.

According to the report, the DOI planned to take several steps to cut costs, including consolidating office space, reducing legal fees to the Attorney General's Office, reducing the travel budget, consolidating field operations, and streamlining the organization. The report also stated that "it will be necessary to reduce staff by 95 positions . . . ."

The report described in detail the impact of two lawsuits brought against the DOI. In the first case, *National Fire Insurance Co. v. Quackenbush* (Super. Ct. S.F. County, 1990, Nos. 918689, 947565), a group of insurers

alleged that the DOI had improperly used fees collected under Proposition 103 (Ins. Code, § 1861.01 et seq.) for purposes unrelated to that proposition.[1] The DOI settled the case by agreeing to refund approximately $6.5 million to the insurance industry. As a result of the *National Fire* litigation, the DOI programs that had previously been subsidized by the Proposition 103 assessments now had to be funded through other sources.[2]

In the other action, *National Association of Independent Insurers v. Garamendi* (July 19, 1995, C016989) (nonpub. opn.) (*NAII*), the Court of Appeal held that the DOI could not charge insurers for the cost of investigating consumer complaints. As a consequence, the DOI not only lost a source of revenue that generated $7 million a year but also had to refund the money already collected, which came to an additional $7 million. Thus, the *NAII* litigation reduced the DOI's revenue by $14 million.

The DOI report also addressed the subject of how employees would be chosen for layoff, as follows: "The process of laying people off is dictated by Department of Personnel Administration (DPA) rules. Generally speaking, it takes about six to nine months from the time the [DOI] identifies the need for layoffs until an individual is actually laid off. Five to six months of this time is devoted to determining the various aspects of seniority, which is the base criteri[on] by which layoffs must occur."

By memorandum dated August 19, 1996, the DOI requested that the Department of Personnel Administration approve the layoff of 45 employees in 24 different civil service classifications. The memo explained that "[t]he Legislature modified our budget plan and in so doing reduced the [DOI's] spending authority and revenue collection capability. As a result of this reduction, the [DOI] is left with a severe revenue/expenditure imbalance." The memo included Duncan's classification, "associate life actuary," as one

---

[1]Section 1 of Proposition 103 provides in part: " 'Enormous increases in the cost of insurance have made it both unaffordable and unavailable to millions of Californians. [¶] 'The existing laws inadequately protect consumers and allow insurance companies to charge excessive, unjustified and arbitrary rates. [¶] 'Therefore, the People of California declare that insurance reform is necessary. First, property-casualty insurance rates shall be immediately rolled back to what they were on November 8, 1987, and reduced no less than an additional 20%. Second, automobile insurance rates shall be determined primarily by a driver's safety record and mileage driven. Third, insurance rates shall be maintained at fair levels by requiring insurers to justify all future increases. Finally, the state Insurance Commissioner shall be elected. *Insurance companies shall pay a fee to cover the costs of administering these new laws so that this reform will cost taxpayers nothing.*' " (Historical and Statutory Notes, 42A West's Ann. Ins. Code (1993 ed.) foll. § 1861.01, p. 649, italics added.)

[2]The DOI has four sources of revenue: fraud assessments, Proposition 103 assessments, examination fees, and fees/licenses.

of those to be eliminated in the Los Angeles area. At some point, the Department of Personnel Administration approved the layoff request.[3]

On October 23, 1996, the DOI informed Duncan in writing that he had been selected for layoff. On November 7, 1996, the DOI sent Duncan's collective bargaining representative a letter, stating that the layoff was scheduled for February 1, 1997, and would impact a minimum of 26 employees.

In a memorandum dated February 7, 1997, the DOI notified Duncan that he would be laid off effective March 14, 1997, "due to revenue losses which have reduced the [DOI's] budget for fiscal year 1996-97." The memo further stated that "[y]our seniority score will allow you to demote in the same location to Senior Actuarial Statistician . . . , Associate Insurance Rate Analyst . . . , or Associate Insurance Policy Officer . . . ." The memo concluded by saying that Duncan could appeal the layoff decision to the Department of Personnel Administration within 30 days and that any appeal "must be based on grounds that the required layoff procedure was not complied with, the layoff was not made in good faith, or was otherwise improper." (See Gov. Code, § 19997.14.)

Duncan decided to accept a demotion to the position of senior actuarial statistician, reducing his monthly pay by $1,508 to an annual salary of $54,564. He also pursued his right to appeal the layoff/demotion. In a letter dated February 19, 1997, Duncan indicated that his appeal was based on several grounds: (1) the layoff procedure was not followed; (2) the layoff was not made in good faith since there was no budget shortfall; (3) the layoff was a pretext to retaliate against him for having filed legitimate grievances against management; and (4) his employment as an associate life actuary was necessary to the mission of the DOI. Apparently, on March 14, 1997, Duncan's demotion to senior actuarial statistician became effective.

On September 24, 1997, an administrative law judge (ALJ) conducted a hearing on Duncan's appeal. At the outset, the parties stipulated that the layoff procedure had been properly followed. The parties also agreed that there were two issues before the ALJ: whether the layoff was fiscally necessary and whether it was made in good faith. The DOI's primary witness was Mike O'Hanlon, the department's supervisor of the budget office. Duncan testified in his own behalf.

On October 23, 1997, the ALJ issued a proposed decision denying Duncan's appeal and sustaining his demotion. The six-page decision recited in

---

[3]Duncan's position was cut in the second round of layoffs. Earlier in the year, the DOI had designated approximately 40 employees for layoff.

part: "As a result of [the DOI's] fiscal crisis, the [DOI] was forced to reduce its staffing. [Duncan's] position was eliminated, along with approximately 95 other employees. [¶] . . . [¶] . . . In the instant case, [the DOI] established that the demotion in lieu of layoff resulted from a critical reduction in revenues."

On December 29, 1997, the Department of Personnel Administration adopted the ALJ's decision. Duncan filed a petition for rehearing, which was denied.

On June 17, 1998, Duncan filed a petition for a writ of mandate, alleging that his layoff was procedurally deficient and substantively wrong.[4] The trial court denied the petition and entered judgment accordingly. Duncan filed a timely appeal.

## DISCUSSION

Duncan contends that the State violated his right to due process by not providing a pre-layoff hearing at which he could challenge the layoff decision. He also asserts that the evidence presented at the administrative hearing did not support the decision to lay him off.[5]

### A. *Administrative Mandate*

A trial court may issue a writ of administrative mandate if an agency has (1) acted in excess of its jurisdiction, (2) deprived the petitioner of a fair hearing, or (3) committed a prejudicial abuse of discretion. (Code Civ. Proc., § 1094.5, subd. (b).) "Abuse of discretion is established if the [agency] has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence." (*Ibid.*)

■ Because demotions and layoffs affect an employee's "fundamental vested right" in employment, a trial court exercises its independent judgment in reviewing an agency's findings of fact. (*Boctor v. Los Angeles County*

---

[4]The petition named the Department of Personnel Administration, the DOI, the Insurance Commissioner, and the State of California as defendants. For convenience, we will occasionally refer to defendants as the "State."

[5]In addition, Duncan argues, as he did below, that a writ of traditional mandate (Code Civ. Proc., § 1085) should issue directing the Insurance Commissioner to promulgate regulations under Insurance Code section 10195.1, subdivision (d). That statute concerns the DOI's review of premiums charged by Medicare supplement insurers. The trial court dismissed this claim on demurrer. We address it in the unpublished portion of the opinion.

*Metropolitan Transit Authority* (1996) 48 Cal.App.4th 560 [55 Cal.Rptr.2d 861]; *Duax v. Kern Community College Dist.* (1987) 196 Cal.App.3d 555, 560-562 [241 Cal.Rptr. 860].) Under the independent judgment test, the trial court may weigh the credibility of witnesses in determining whether the findings of the agency are supported by the weight, or preponderance, of the evidence. (*Governing Board v. Haar* (1994) 28 Cal.App.4th 369, 377 [33 Cal.Rptr.2d 744]; *Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 808, 819-822 [85 Cal.Rptr.2d 696, 977 P.2d 693]; 8 Witkin, Cal. Procedure (4th ed. 1997) Extraordinary Writs, §§ 274, 286, pp. 1075, 1090; Code Civ. Proc., § 1094.5, subds. (b), (c).) On appeal, we review the trial court's findings of fact to determine whether they are supported by substantial evidence on the whole record. (*Kazensky v. City of Merced* (1998) 65 Cal.App.4th 44, 52 [76 Cal.Rptr.2d 356]; 8 Witkin, Cal. Procedure, *supra*, § 274, p. 1075.)[6]

Thus, " '[t]here might be foundational matters of fact with respect to which the trial court's findings would be conclusive on appeal if supported by substantial evidence. However, the ultimate questions, whether the agency's decision was . . . unlawful or procedurally unfair, are essentially questions of law. With respect to these questions the trial and appellate courts perform essentially the same function, and the conclusions of the trial court are not conclusive on appeal.' . . . That is, foundational factual findings must be sustained if supported by substantial evidence; however, the ultimate determination of whether the administrative proceedings were fundamentally fair is a question of law to be decided on appeal." (*Rosenblit v. Superior Court* (1991) 231 Cal.App.3d 1434, 1443 [282 Cal.Rptr. 819], citations omitted.) Put another way, we review questions of law de novo. (*Bostean v. Los Angeles Unified School Dist.* (1998) 63 Cal.App.4th 95, 107-108 [73 Cal.Rptr.2d 523]; *Riveros v. City of Los Angeles* (1996) 41 Cal.App.4th 1342, 1348-1350 [49 Cal.Rptr.2d 238].)

## 1. *Due Process*

■■ The due process clauses of the federal and state Constitutions provide that a person may not be deprived of life, liberty, or property

---

[6]Under the substantial evidence test, " '[t]he power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted,' to support the trial court's findings. . . . 'We must therefore view the evidence in the light most favorable to the prevailing [party], giving [it] the benefit of every reasonable inference and resolving all conflicts in [its] favor. . . .' " (*Estate of Leslie* (1984) 37 Cal.3d 186, 201 [207 Cal.Rptr. 561, 689 P.2d 133], citations omitted.) "[T]he focus is on the quality, not the quantity of the evidence. Very little solid evidence may be 'substantial,' while a lot of extremely weak evidence might be 'insubstantial.' " (*Toyota Motor Sales U.S.A., Inc.* v. *Superior Court* (1990) 220 Cal.App.3d 864, 871-872 [269 Cal.Rptr. 647].) The testimony of a single witness may be sufficient. (*In re Marriage of Birnbaum* (1989) 211 Cal.App.3d 1508, 1513 [260 Cal.Rptr. 210].)

without due process of law. (Cal. Const., art. I, § 7, subd. (a); U.S. Const., 14th Amend., § 1.) Duncan's due process claim rests on two premises: first, that he had a constitutionally protected property interest in his employment as an associate life actuary and, second, that he accepted a demotion to senior actuarial statistician because the State improperly denied him an opportunity to challenge the layoff decision before it became effective. We agree with the first contention but reject the second.[7]

■ "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined. It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims. [¶] Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law— rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." (*Board of Regents v. Roth* (1972) 408 U.S. 564, 577 [92 S.Ct. 2701, 2709, 33 L.Ed.2d 548].)

■ As our Supreme Court explained in *Skelly v. State Personnel Bd.* (1975) 15 Cal.3d 194 [124 Cal.Rptr. 14, 539 P.2d 774] (*Skelly*): "The California [Civil Service] Act endows state employees who attain permanent status with a [legitimate claim of a protectible] property interest. Such employees may not be dismissed or subjected to other disciplinary measures unless facts exist constituting 'cause' for such discipline . . . . In the absence of sufficient cause, the permanent employee has a statutory right to continued employment free of these punitive measures. . . . This statutory right constitutes 'a legitimate claim of entitlement' to a government benefit . . . . Therefore, the state must comply with procedural due process requirements before it may deprive its permanent employee of this property interest by punitive action." (*Id.* at pp. 207-208, citation omitted; see Gov. Code, §§ 18528, 19170, 19996, 19997, subd. (a).)

■ Although "some form of notice and hearing must precede a final deprivation of property[,] . . . 'the timing and content of the notice and the nature of the hearing will depend on an appropriate accommodation of the competing interests involved.' " (*Skelly, supra,* 15 Cal.3d at p. 209, italics omitted.) By way of example, in cases involving allegations of employee

---

[7]Duncan does not contend that the State deprived him of a liberty interest.

misconduct that warrant discharge, the question is whether a hearing must be "afforded prior to the time that the initial removal decision [becomes] effective." (*Id.* at p. 212.) In resolving that question, the court must balance " 'the Government's interest in expeditious removal of an unsatisfactory employee . . . against the interest of the affected employee in continued public employment.' " (*Ibid.*)

"It is clear that due process does not require the state to provide the employee with a full trial-type evidentiary hearing prior to the initial taking of punitive action. However, . . . due process does mandate that the employee be accorded certain procedural rights before the discipline becomes effective. As a minimum, these preremoval safeguards must include notice of the proposed action, the reasons therefor, a copy of the charges and materials upon which the action is based, and the right to respond, either orally or in writing, to the authority initially imposing discipline." (*Skelly*, *supra*, 15 Cal.3d at p. 215.) And, of course, a public employee is entitled to a full evidentiary hearing after the disciplinary action is imposed. (*Ibid.*)

In *Cleveland Board of Education v. Loudermill* (1985) 470 U.S. 532 [105 S.Ct. 1487, 84 L.Ed.2d 494] (*Loudermill*), another case involving the discharge of public employees, the United States Supreme Court stated:

"[Due process] requires 'some kind of a hearing' prior to the discharge of an employee who has a constitutionally protected property interest in his employment. . . .

"The need for some form of pretermination hearing . . . is evident from a balancing of the competing interests at stake. These are the private interest in retaining employment, the governmental interest in the expeditious removal of unsatisfactory employees and the avoidance of administrative burdens, and the risk of an erroneous termination. . . .

"First, the significance of the private interest in retaining employment cannot be gainsaid. We have frequently recognized the severity of depriving a person of the means of livelihood. . . . While a fired worker may find employment elsewhere, doing so will take some time and is likely to be burdened by the questionable circumstances under which he left his previous job. . . .

"Second, some opportunity for the employee to present his side of the case is recurringly of obvious value in reaching an accurate decision. Dismissals for cause will often involve factual disputes. . . . Even where the facts are clear, the appropriateness or necessity of the discharge may not be; in such

cases, the only meaningful opportunity to invoke the discretion of the decisionmaker is likely to be before the termination takes effect. . . . [¶] . . . [¶]

"The governmental interest in immediate termination does not outweigh these interests. . . . [A]ffording the employee an opportunity to respond prior to termination would impose neither a significant administrative burden nor intolerable delays. . . . [¶] . . . [¶]

". . . [T]he pretermination 'hearing,' though necessary, need not be elaborate. . . . '[T]he formality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings.' . . . In general, 'something less' than a full evidentiary hearing is sufficient prior to adverse administrative action. . . . Under state law, [the terminated employees are] later entitled to a full administrative hearing and judicial review. The only question is what steps [are] required before the termination [takes] effect. [¶] . . . [¶]

". . . The opportunity [for the employee] to present reasons, either in person or in writing, why proposed action should not be taken is a fundamental due process requirement. . . . The tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." (*Loudermill, supra,* 470 U.S. at pp. 542-546 [105 S.Ct. at pp. 1493-1495], citations and fns. omitted.)[8]

While *Skelly* and *Loudermill* involved employees who had been discharged, our Supreme Court faced a different set of circumstances in *Coleman v. Department of Personnel Administration* (1991) 52 Cal.3d 1102 [278 Cal.Rptr. 346, 805 P.2d 300]. There, an employee was deemed by statute to have resigned because he missed five consecutive days of work without leave. The pertinent law (Gov. Code, § 19996.2, subd. (a)), commonly known as the "AWOL" statute, provides: "Absence without leave, whether voluntary or involuntary, for five consecutive working days is an automatic

---

[8]*Loudermill* involved the discharge of two employees: a security guard who provided false information on his job application, and a bus mechanic who failed an eye exam. (*Loudermill, supra,* 470 U.S. at pp. 535-536 [105 S.Ct. at pp. 1489-1490].)

resignation from state service, as of the last date on which the employee worked. . . ."

In concluding that an AWOL employee has a due process right to a preseverance hearing but not a postseverance hearing—unlike a discharged employee, who is entitled to both—the high court emphasized the distinctions between a discharge and a resignation:

"When loss of the vested right to continued state employment results from a disciplinary dismissal, the attendant stigma of the discharge may threaten the affected employee's future livelihood. For instance, a disciplinary discharge resulting from dishonesty or insubordination tarnishes the employee's good name and may therefore hamper the ability to obtain future employment. . . .

". . . Unlike a disciplinary discharge, resignation from state employment does not seriously damage an employee's standing and associations in the community, nor does it foreclose other employment opportunities. . . . A resignation, therefore, carries no stigma. [¶] . . . [¶]

"There is one other significant distinction between a dismissal for disciplinary reasons and a constructive resignation under the AWOL statute: the manner in which it affects an employee's right to future state employment. An employee who has been discharged for cause can thereafter be disqualified from taking a civil service examination. . . . By contrast, an employee who has resigned can be reinstated. . . . And in the case of a resignation under the AWOL statute, there is express language in the statute allowing for reinstatement upon 'satisfactory explanation' for the unexcused absence and a showing that the employee is 'ready, able, and willing' to resume duties. . . .

"These marked differences between a resignation under the AWOL statute and a disciplinary dismissal militate against imposing identical procedural protections in each instance. . . . [¶] . . . [¶]

". . . Unlike a disciplinary dismissal, due process in this case does not require that the state also give the employee a postseverance evidentiary hearing at which the employee may be represented by counsel, may call witnesses, or may cross-examine adverse witnesses." (*Coleman v. Department of Personnel Administration, supra,* 52 Cal.3d at pp. 1119-1122, citations and fns. omitted.)

More recently, in *Gilbert v. Homar* (1997) 520 U.S. 924 [117 S.Ct. 1807, 138 L.Ed.2d 120], the United States Supreme Court held that there may be situations where a public employee can be disciplined without any type of predeprivation hearing. In *Gilbert*, the plaintiff was employed as a police officer at a state university. While at the home of a friend, he was arrested by state police during a drug raid. Later that day, the plaintiff was charged with various drug offenses. Upon learning of the arrest, the university administration immediately suspended the plaintiff without pay. A month later, the university demoted the plaintiff to the position of groundskeeper. The plaintiff brought suit, alleging that the university had violated his right to due process by suspending him without a hearing. The court rejected that argument, stating:

" '[W]e have rejected the proposition that [due process] *always* requires the State to provide a hearing prior to the initial deprivation of property.' . . . [¶] . . . [¶]

"To determine what process is constitutionally due, we have generally balanced three distinct factors:

" 'First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest.' . . .

". . . [W]hile our opinions have recognized the severity of depriving someone of the means of his livelihood . . . , they have also emphasized that in determining what process is due, account must be taken of 'the *length*' and '*finality* of the deprivation.' . . . Unlike the employee in *Loudermill*, who faced *termination*, [the plaintiff here] faced only a *temporary suspension* without pay. So long as the suspended employee receives a sufficiently prompt postsuspension hearing, the lost income is relatively insubstantial (compared with termination), and fringe benefits such as health and life insurance are often not affected at all . . . .

"On the other side of the balance, the State has a significant interest in immediately suspending, when felony charges are filed against them, employees who occupy positions of great public trust and high public visibility, such as police officers. [The plaintiff] contends that this interest in maintaining public confidence could have been accommodated by suspending him *with* pay until he had a hearing. We think, however, that the government

does not have to give an employee charged with a felony a paid leave at taxpayer expense. If his services to the government are no longer useful once the felony charge has been filed, the Constitution does not require the government to bear the added expense of hiring a replacement while still paying him. . . .

"The last factor in the . . . balancing [test], and the factor most important to resolution of this case, is the risk of erroneous deprivation and the likely value of any additional procedures. . . . We noted in *Loudermill* that the purpose of a pre-*termination* hearing is to determine 'whether there are reasonable grounds to believe the charges against the employee are true and support the proposed action.' . . . By parity of reasoning, the purpose of any pre-*suspension* hearing would be to assure that there are reasonable grounds to support the suspension without pay. . . . But here that has already been assured by the arrest and the filing of charges.

". . . [A]s with an indictment, the arrest and formal charges imposed upon [the plaintiff] 'by an independent body demonstrat[e] that the suspension is not arbitrary.' . . . [L]ike an indictment, the imposition of felony charges 'itself is an objective fact that will in most cases raise serious public concern.' . . . [F]or present purposes arrest and charge give reason enough. They serve to assure that the state employer's decision to suspend the employee is not 'baseless or unwarranted,' . . . in that an independent third party has determined that there is probable cause to believe the employee committed a serious crime." (*Gilbert v. Homar, supra*, 520 U.S. at pp. 930-934 [117 S.Ct. at pp. 1812-1814], citations omitted.)

■ Based on the foregoing principles, we now apply the three-factor balancing test in the present case. Since Duncan received a postdemotion hearing in accordance with statutory law (see Gov. Code, § 19997.14), the question before us is whether the due process clause required a predemotion hearing.

First, although "the significance of the [employee's] interest in *retaining* employment cannot be gainsaid" (*Loudermill, supra*, 470 U.S. at p. 543 [105 S.Ct. at p. 1494], italics added), that interest is of little importance where, as here, the employee *remains* employed, albeit in a lower paying position. This is not a case where "a fired worker [must] find employment elsewhere . . ." (*ibid.*), nor is it a case where " '[d]uring the . . . delay [in the postdeprivation hearing], the employee is off the . . . payroll . . .' " (*Skelly, supra*, 15 Cal.3d at p. 213). By accepting a demotion, Duncan preserved his "means of livelihood." (*Loudermill, supra*, 470 U.S. at p. 543 [105 S.Ct. at p. 1494].)

Further, just as a resignation carries no stigma (*Coleman v. Department of Personnel Administration, supra,* 52 Cal.3d at p. 1120), neither does a layoff. "The reasoning behind the necessity of a [predeprivation] hearing is that [a] termination for cause carries with it a stigmatization which might impair a person's ability to secure future employment. . . . However, . . . [d]ismissal because of a company-wide layoff carries with it no stigmatization which would impair a dismissed employee's future job prospects." (*Franks v. Magnolia Hosp.* (N.D.Miss. 1995) 888 F.Supp. 1310, 1313-1314, affd. mem. (5th Cir. 1996) 77 F.3d 478, citation omitted; accord, *Mayfield v. Kelly* (D.D.C. 1992) 801 F.Supp. 795, 798, app. dism. in part *sub nom. Bridges v. District of Columbia Government* (D.C. Cir. 1993) 998 F.2d 7 [302 App. D.C. 389].)

Unlike the situations in *Skelly* and *Loudermill,* where the employees were discharged because of their misconduct or inability to perform, a layoff is the result of financial exigency, not the actions of a particular employee, good or bad. (See *Casse v. Sumrall* (La.Ct.App. 1989) 547 So.2d 1381, 1386.)[9] Equally important, an employee who is laid off, like an employee who resigns, can be reinstated. (Gov. Code, §§ 19140, 19997.2, 19997.11, 19056.) Or he can opt for a demotion, as Duncan did. (See *id.* at § 19997.8.) Simply put, because a demotion in lieu of layoff does not constitute the type of punitive discipline at issue in *Skelly* and *Loudermill,* the employee's interests are of less concern. (See *Mayfield v. Kelly, supra,* 801 F.Supp. at p. 798; *Refai v. Central Washington University* (1987) 49 Wn.App. 1, 16 [742 P.2d 137, 146].)

Turning to the second factor—the risk of an erroneous deprivation through the procedure actually used, and the probable value, if any, of additional or substitute procedural safeguards—the scale tips in favor of the State. In contrast to disciplinary matters, which usually focus on the actions of a single employee, a layoff is based on the "big picture"—an extensive, time-consuming examination of a department or agency from top to bottom. (See *Casse v. Sumrall, supra,* 547 So.2d at pp. 1386-1387.) That examination produces data from which the layoff decision is made.

Budget figures naturally play an important role in determining whether layoffs are necessary and, if so, to what extent. In the civil service system, seniority typically provides the primary criterion in determining which employees to let go. (See Gov. Code, § 19997.3.) As stated in the Staffing

---

[9]Duncan was laid off pursuant to section 19997, subdivision (a), of the Government Code, which provides: "Whenever it is necessary because of lack of work or funds, or whenever it is advisable in the interests of economy, to reduce the staff of any state agency, the appointing power may lay off employees pursuant to this article and department rule. . . ."

Reduction Policy and Procedure Manual of the Department of Personnel Administration: "Normally, layoffs are in seniority order regardless of time base; that is, the least senior employees, regardless of whether they are part time, intermittent, or full time, are laid off first." By using objective criteria, such as financial information and seniority, the State reduces the risk of an erroneous prehearing decision. (See *Casse v. Sumrall, supra,* 547 So.2d at p. 1387; *Firefighters Local 632 v. Civ. Service Com'n* (La.Ct.App. 1986) 495 So.2d 958, 963.)[10]

The DOI invested considerable time and effort in developing and implementing the layoff plan. As explained in the DOI's August 1996 report, once the DOI decides that layoffs are necessary, it takes six to nine months before an individual is actually laid off. Most of that time is spent determining the various aspects of seniority. And, during that process, the DOI is not the only government entity involved: The Department of Personnel Administration has to review and approve the DOI's request for layoffs and its selection of affected employees. (See, e.g., Gov. Code, §§ 19997, 19997.2, subd. (a), 19997.3, subds. (a)(1), (2), (b).)

Here, given that (1) the layoffs were based in large part on objective criteria, (2) the DOI expended significant resources in furtherance of the layoff plan, and (3) a second government entity reviewed and approved the layoffs, it is unlikely that a pre-layoff hearing would have reduced the risk, if any, of an error. (See *Casse v. Sumrall, supra,* 547 So.2d at p. 1387; *Refai v. Central Washington University, supra,* 49 Wn.App. at pp. 16-17 [742 P.2d at p. 146].) The decisionmaking process, as so structured, served to assure that the DOI's layoff plan was not " 'baseless or unwarranted.' " (*Gilbert v. Homar, supra,* 520 U.S. at p. 934 [117 S.Ct. at p. 1814].) In short, the DOI had "reasonable grounds to believe that the [financial data] . . . support[ed] the proposed action." (*Loudermill, supra,* 470 U.S. at p. 546 [105 S.Ct. at p. 1495].)[11]

Finally, we consider the third factor: the interests of the government. Surely, in a time of financial crisis, the State has a significant interest in taking quick steps to resolve its economic woes.

---

[10]In some situations, an employee's efficiency may be considered in deciding whether to lay him off. (See Gov. Code, § 19997.3, subd. (b).) In the present case, neither side contends that Duncan's efficiency or job performance influenced the layoff decision. Nor does Duncan take issue with the importance of seniority in the layoff process. We also note that, while Duncan asserted in the administrative hearing that his layoff was retaliatory, he does not pursue that contention on appeal.

[11]Several statutory provisions governing the employment of civil servants are qualified by language indicating that if the statute conflicts with a memorandum of understanding (MOU), the MOU takes precedence. (See, e.g., Gov. Code, §§ 19997.3, 19997.8, 19997.11.) Duncan does not rely on an MOU in that respect.

It is one thing for the State to provide a predeprivation hearing for a single employee who has been demoted because of misconduct. (See *Ng v. State Personnel Bd.* (1977) 68 Cal.App.3d 600, 605-606 [137 Cal.Rptr. 387].) It is quite another to require the State to conduct pre-layoff hearings for 95 employees in the midst of a financial crisis. Indeed, the cost of such hearings would simply exacerbate the crisis, primarily because the State would have to keep the affected employees on the payroll pending the outcome of the hearings. Nor could an employer conduct an adequate "group hearing," since each employee would want to explain why his or her particular position should not be eliminated or why he or she is more deserving of retention than others. Ironically, the cost of pre-layoff hearings might well have the ultimate effect of increasing the number of employees subject to layoff.

"Where a reorganization or other cost-cutting measure results in dismissal of an employee[,] no [predeprivation] hearing is due." (*Duffy v. Sarault* (1st Cir. 1989) 892 F.2d 139.) "In the ordinary, budgetary lay-off situation, . . . individual pre-lay-off hearings are not necessary given the impracticality of imposing such a requirement." (*Praprotnik v. City of St. Louis* (8th Cir. 1986) 798 F.2d 1168, 1177, revd. on other grounds (1988) 485 U.S. 112 [108 S.Ct. 915, 99 L.Ed.2d 107]; accord, *Franks v. Magnolia Hosp.*, *supra*, 888 F.Supp. at p. 1314; *Graham v. Triway Bd. of Edn.* (1992) 82 Ohio App.3d 34, 39 [610 N.E.2d 1185, 1188].)[12]

As the United States Supreme Court has observed: "Financial cost alone is not a controlling weight in determining whether due process requires a particular procedural safeguard prior to some administrative decision. But the Government's interest, and hence that of the public, in conserving scarce fiscal and administrative resources is a factor that must be weighed. At some point the benefit of an additional safeguard to the individual affected by the administrative action and to society in terms of increased assurance that the action is just, may be outweighed by the cost. Significantly, the cost of protecting those whom the preliminary administrative process has identified as likely to be found undeserving may in the end come out of the pockets of the deserving since resources available for any particular program . . . are not unlimited." (*Mathews v. Eldridge* (1976) 424 U.S. 319, 348 [96 S.Ct. 893, 909, 47 L.Ed.2d 18].)

For these reasons, we conclude that the trial court properly denied Duncan's petition for a writ of administrative mandate.

---

[12]An exception to these general rules may exist where the layoff is pretextual. (See *Franks v. Magnolia Hosp.*, *supra*, 888 F.Supp. at pp. 1315-1316.) Duncan does not argue that he falls within that exception. (See fn. 10, *ante*.)

## 2. *Substantial Evidence**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## B. *Traditional Mandate**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### DISPOSITION

The judgment is affirmed insofar as it denied the petition for a writ of administrative mandate (Code Civ. Proc., § 1094.5). The judgment is reversed as to the denial of the petition for a writ of traditional mandate (Code Civ. Proc., § 1085), and the trial court is directed to issue a writ directing the Commissioner of Insurance to promulgate regulations pursuant to Insurance Code section 10195.1, subdivision (d). The parties are to bear their own costs on appeal.

Spencer, P. J., and Vogel (Miriam A.), J., concurred.

---

*See footnote, *ante*, page 1166.