Filed 3/20/14  Anderson v. County of Orange CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| JACK ANDERSON et al., | |
| Plaintiffs and Appellants, | G047161 |
| v. | (Super. Ct. No. 30-2010-00376368) |
| COUNTY OF ORANGE et al., | O P I N I O N |
| Defendants and Respondents. | |

Appeal from a judgment of the Superior Court of Orange County, David R. Chaffee, Judge.  Reversed.

Law Offices of Joel W. Baruch, Joel W. Baruch and Nikki Fermin for Plaintiffs and Appellants.

Lynberg & Watkins, Norman J. Watkins, S. Frank Harrell, and Alexandru D. Mihai for Defendants and Respondents.

\*          \*          \*

In 2009, plaintiffs[1] were terminated from their senior positions with the Orange County Sheriff's Department (the Department). Sheriff Sandra Hutchens characterized the terminations as layoffs necessitated by budget cuts following the recent economic downturn. Plaintiffs sued the County of Orange (the County), Hutchens, and County Executive Officer Thomas Mauk under a variety of legal theories. Defendants were granted a judgment of dismissal based in large measure on a successful motion for summary adjudication. We reverse the judgment of dismissal. The order granting defendants' motion for summary adjudication is reversed with regard to plaintiffs' causes of action based on alleged violations of the Public Safety Officers Procedural Bill of Rights Act (POBRA or the Act), Government Code section 3300 et seq.[2] The order granting defendants' motion for summary adjudication with regard to the causes of action for contempt and breach of contract is affirmed.

LEGAL BACKGROUND

The heart of plaintiffs' case is that the County violated POBRA. POBRA applies to all "public safety officer[s]" (as defined in § 3301), up to and including police chiefs serving at the pleasure of local officials. (*Gray v. City of Gustine* (1990) 224 Cal.App.3d 621, 625-627.) POBRA recognizes that the employment of public safety officers, even by local governments, is "a matter of statewide concern." (§ 3301.) "[T]he plain purpose of the Act is to assure the provision of effective law enforcement services throughout the state by maintaining stable employment relations between . . . public safety officers and their employers." (*Burden v. Snowden* (1992) 2 Cal.4th 556, 566.)

---

[1] Plaintiffs include Jack Anderson, John Davis, Brian Cossairt, Deana Bergquist, and Robert Eason.

[2] All statutory references are to the Government Code, unless otherwise stated.

"The various procedural protections provided by POBRA 'balance the public interest in maintaining the efficiency and integrity of the police force with the police officer's interest in receiving fair treatment.'" (*Mays v. City of Los Angeles* (2008) 43 Cal.4th 313, 320.)

Public safety officers may sue their employers in superior court for perceived violations of the Act. (§ 3309.5, subd. (c).) "In any case where the superior court finds that a public safety department has violated any of the provisions of this chapter, the court shall render appropriate injunctive or other extraordinary relief to remedy the violation and to prevent future violations . . . ." (§ 3309.5, subd. (d)(1).) When malicious violations of POBRA are proven, a public safety department may also be held liable for actual damages, attorney fees, and civil penalties up to $25,000 per violation. (§ 3309.5, subd. (e).)

Only one of the varied rights provided by the Act[3] is directly at issue here: "No punitive action . . . shall be undertaken by any public agency against any public safety officer . . . without providing the public safety officer with an opportunity for administrative appeal." (§ 3304, subd. (b).) For purposes of the Act, "punitive action

---

[3] The Act "provides in substance that all public safety officers shall have the following rights: To engage in political activity while off duty and out of uniform or to abstain from such activity (§ 3302, subd. (a)); to seek election to a school board (§ 3302, subd. (b)); that interrogations of officers under investigation be conducted in the manner indicated (§ 3303); to not be subject to punitive action or denied promotion because of the lawful exercise of the rights granted under the Act and have the opportunity of an administrative appeal (§ 3304); that no adverse comment shall be placed in an officer's personnel file unless the officer is given the opportunity to read and sign the instrument containing the adverse comment (§ 3305); that the affected officer shall have 30 days in which to respond to such adverse comments (§ 3306); to not be compelled to submit to a polygraph examination (§ 3307); to not be required to make financial disclosures, with certain specified exceptions (§ 3308); and that an officer's locker shall not be searched except under specified circumstances (§ 3309)." (*Gray v. City of Gustine*, *supra*, 224 Cal.App.3d at pp. 625-626; see also § 3312 [added to the Act in 2002 to protect officers against punitive action for wearing pins or other items depicting the American flag, except in specified circumstances].)

means any action that may lead to dismissal, demotion, suspension, reduction in salary, written reprimand, or transfer for purposes of punishment." (§ 3303.) Defendants posit that being laid off for economic reasons is not a punitive action entitling an officer to an administrative appeal. (See *White v. County of Sacramento* (1982) 31 Cal.3d 676, 683, fn. 4 (*White*) [dictum suggesting "the right to an administrative appeal provided by section 3304 . . . does not apply where police officers are laid off as part of a mass reduction in personnel due, for example, to budgetary constraints"].) Plaintiffs disagree (cf. *Riverside Sheriffs' Assn. v. County of Riverside* (2009) 173 Cal.App.4th 1410, 1426 [termination is "per se punitive" even in context of involuntary disability retirement]), and note that even if *White* accurately states the law with regard to POBRA, they were not terminated as part of a mass, rule-based layoff but instead were individually selected for termination out of the ranks of senior officers (most of whom were retained).

Assuming (as the trial court did) that POBRA applies to the termination of plaintiffs' employment, the key question is whether defendants complied with their obligation under section 3304, subdivision (b). "Section 3304 requires only that an *opportunity* for administrative appeal be provided. It does not specify how the appeal process is to be implemented. [Citation.] The details of administrative appeal under section 3304, subdivision (b) are left to be formulated by the local agency." (*Binkley v. City of Long Beach* (1993) 16 Cal.App.4th 1795, 1806; see § 3304.5 ["An administrative appeal instituted by a public safety officer under this chapter shall be conducted in conformance with rules and procedures adopted by the local public agency"].) But not every procedure offered by a local agency is sufficient to qualify as a section 3304, subdivision (b), "administrative appeal." (*Giuffre v. Sparks* (1999) 76 Cal.App.4th 1322, 1328-1332 [procedures outlined in memorandum of understanding between locality and police officer union were insufficient]; *Runyan v. Ellis* (1995) 40 Cal.App.4th 961, 965-967 [same].)

FACTS

As a result of a complicated procedural history (discussed in further detail below), the factual material underlying the court's grant of summary adjudication was not all submitted in the usual manner (i.e., as part of the motion and opposition papers). The court provided the parties with an opportunity to submit additional briefing and evidence after the initial hearing. For now, we ignore the source and timing of the factual material in order to present a straightforward, coherent account of the relevant facts. The facts set forth herein are for the most part undisputed, with the exception of the defense witnesses' description of their own intentions.

*Background Information Pertaining to the Parties*

Plaintiffs were longstanding employees of the Department. As of 2009, each of the plaintiffs served in high-level positions with the Department: Anderson, assistant sheriff;[4] Davis, assistant sheriff; Cossairt, captain; Bergquist, captain; and Eason, captain.

Sandra Hutchens assumed the position of sheriff in June 2008 and has served continuously in her post since that time. Hutchens promptly hired three former colleagues to serve in high profile positions: John Scott as undersheriff, Michael Hillmann as assistant sheriff, and Lee McGown as a paid consultant. These hires cost the County more than $600,000 in salaries alone on an annual basis. Although Hillmann served in the same assistant sheriff position as plaintiffs Anderson and Davis, he earned $3 more per hour.

Each of the plaintiffs had run-ins with the new administration. Hutchens and Scott criticized Anderson's performance on several occasions. Anderson was read

--------

[4] Anderson briefly served as "Acting Sheriff" in 2008, following the resignation of former Sheriff Michael Carona.

his *Miranda*[5] rights during one December 2008 interview at which Scott was present; Anderson was subsequently provided with verbal counseling by Scott concerning a perceived violation of Department policy. Davis had personality and policy disputes with Scott and Hillmann. On one occasion, Hutchens asked Cossairt about his association with former Sheriff Carona. On another occasion, Cossairt was informed by an assistant to Hutchens that he should cease a project using funds Hutchens wished to access for other purposes. Cossairt did not stop the project because of its necessity. Bergquist was transferred and came into conflict with her new supervisor. Eason was transferred to a new position following a policy dispute with Hutchens and Scott.

*The Termination of Plaintiffs*

The fiscal year 2009-2010 budget approved by the Orange County Board of Supervisors required $28 million in cuts to the Department budget. Based on revenue projections available to Hutchens in September 2009, the Department was required to prepare for an additional $60 million in cuts in fiscal year 2010-2011.

Scott sent a July 9, 2009 e-mail to division commanders outlining the development of a strategic financial plan for fiscal year 2010-2011. In this e-mail, Scott disclosed that the "Executive Command . . . 'Tentatively' approved a re-organization that consolidates the existing commands into fewer executives at the top, cutting two Assistant Sheriffs and six Captains from the current organization."

The County's Personnel and Salary Resolution (PSR) states the following under the heading "Order of Layoff": "A. When a reduction in the work force is implemented, each Agency/Department Head shall determine, subject to CEO approval, which employees are subject to layoff based on the needs of the organization. [¶] B. In considering which employees shall be subject to layoff, consideration shall be given to

---

[5] *Miranda v. Arizona* (1966) 384 U.S. 436.

6

knowledge and skills related to organizational need and the employee's performance." The PSR requires the County to provide at least 14 days written notice of layoff to the affected employee. The PSR also provides a general grievance procedure, pursuant to which County employees could contest the application of the layoff procedure. The general grievance procedure provides three levels of review: (1) Immediate Supervisor; (2) Agency/Department Head; and finally, (3) Human Resources Director (available in limited cases, including "an interpretation or an application of the" PSR). The general grievance procedure is instigated only by the prompt submission of a grievance by an employee. In contrast, the disciplinary procedures in the PSR provide for pre-disciplinary notice and a hearing, as well as the right to appeal, in cases of termination for cause. Hutchens was required to follow the PSR in implementing a reduction in the Department's work force.

In August 2009, Hutchens and Scott told plaintiffs that they would be laid off as a result of their commands being consolidated with the commands of others, including recent Hutchens' hires Scott and Hillmann. Plaintiffs were not explicitly offered a hearing or administrative appeal of their termination at that time.

On September 24, 2009, Hutchens transmitted a formal one-page termination letter to each plaintiff. The letters began by citing the economic difficulties faced by the Department. The letters represented that "[t]he decision of who would be laid off was made as a result of what functions could be eliminated and/or combined without directly impacting our core mission. These layoffs were not based on performance; they were based on the elimination or consolidation of functions and were made solely because of our current financial situation."[6] The letters released each

---

[6] Hutchens declared under penalty of perjury that "[t]he paramount consideration that [she] applied in making position cuts" in September 2009, including those of plaintiffs, "was ensuring the continued safety of Orange County's residents. Based on my public safety analysis, certain top command positions were eliminated and others were asked to take on the responsibilities of the eliminated positions (in addition to

7

plaintiff from their employment effective October 9, 2009.  The letters concluded with the following statement: "You are entitled to a Liberty Interest Hearing.  To exercise this right and request a hearing, you must notify Carl Crown, Human Resources Director, . . . in writing, within fourteen (14) calendar days from the date of this notification."

*The Hearings* (*Or*, *More Accurately*, *the Lack Thereof*)

None of the plaintiffs actually participated in the liberty interest hearing offered by Hutchens in the termination letters.  According to his declaration, Anderson "did not ask for the 'liberty interest' hearing" for a mixed bag of reasons, including his belief that such a hearing was not an appropriate forum for his concerns, the perceived futility of the hearing, his lack of information at the time about the true reasons for his termination, and his need to retire to receive benefits to support his family.  Davis likewise explained he did not think a hearing would be fruitful based on the stated reason for his termination.  Davis noted that had he known at the time of the allegedly true reason for his dismissal (i.e., "perceived performance deficiencies or misconduct issues"), he "would have asked for an appeal to reverse the decision."

Cossairt attested that he "did not ask about a 'liberty interest' hearing since I understood it was for a 'name clearing' and I had been told that I did not do anything wrong."  Cossairt stated at his deposition that he did not "believe that there was anything that a liberty interest hearing would help me with, getting my job back, doing anything else."  Bergquist explained her lack of participation at a hearing as stemming from her understanding that the hearing would not apply to her and she felt compelled "to retire in order to help support [her] family."  Bergquist testified at her deposition that she did not schedule a hearing in part because her termination letter contained no negative statements about the quality of her work.

the work they already performed)."

8

Eason contacted human relations to set up a hearing. Eason requested information about his alleged misconduct prior to the hearing. Eason never received any information about whether something negative about him had influenced the decision to terminate his employment. Eason testified at his deposition that the County human resources "people . . . were willing to do it. There was some scheduling issues and other little things like that, but I never got the impression they didn't want to meet." Eason never participated in a hearing. Eason did not know what he would say at the hearing. "How can I go in to address something I don't know what it is other than what I think it is? How can I go in and say it's because I didn't agree with this or that or the other thing?"

Crown, the County's human resources director, intended to serve as the individual conducting the hearings offered in the termination letters. According to his declaration, it was Crown's intent "to listen to any issue(s) raised by Plaintiffs in the event they chose to contact [his] office. It was my intent to permit Plaintiffs free range to raise any issue(s) of their choosing at the hearings offered them — including any grievances Plaintiffs might have had regarding their employment with the County." "Had any of the Plaintiffs attended the hearing offered them and raised any of the allegations they now raise in this case, it would have been my practice to contact County Counsel and seek legal advice as to the County's obligations, if any, under the applicable law. Again, I did not have the opportunity to hear Plaintiffs' allegations because they never voiced them to me at the administrative hearing I planned to conduct."

Another terminated Captain, Christine Murray,[7] inquired about the liberty interest hearing and communicated with plaintiffs about her efforts. Murray asked several questions by e-mail of human resources employee Bob Leys, including whether she could have representation at the hearing ("Yes"), whether she should obtain evidence

---

[7] Murray is not a plaintiff in this case.

("Please consult with your representative"), and whether she should submit materials in writing (not necessary, but "helpful to submit . . . something in writing at the hearing"). Leys answered (by e-mail) Murray's question about whether she could present witnesses with the following response: "No. This is not an evidentiary hearing so witnesses are not necessary." Murray did not actually attend a hearing.

In a declaration, Leys attested that at the time of his e-mail, his "only knowledge of her employment situation was that Ms. Murray was being laid off for budgetary reasons alone. If Ms. Murray were to simply express displeasure at the County's budgetary shortfall at her hearing, I saw limited value in witness testimony and advised Ms. Murray of that fact in my October 1, 2009 email." "At the time I wrote my October 1, 2009 email to Ms. Murray, she had not voiced her present position to me (i.e., that, in her mind, she was being discharged for performance-based reasons). If Ms. Murray had expressed this position to me before I wrote my October 1, 2009 email, it would have been my practice to consult with County Counsel for an appropriate response which satisfied pertinent legal obligations. If standard office procedure was followed, the final call from the Human Resources Department on what form Ms. Murray's hearings would take would be made by my supervisor, Mr. Carl Crown."

*Post-termination Events*

One day after the effective date of the terminations, Hutchens held an off-site leadership retreat. A powerpoint presentation at the retreat included slides suggesting a key to improving the Department was getting the right people "on the bus" and the wrong people "off the bus"; one slide included a picture of a bus with photographs inserted of the remaining Department leadership (including Hutchens in the driver's seat). Another slide included two cartoons with the captions "Ship of Fools" and "Car of Idiots."

A February 2010 email from Hutchens to the Department stated in relevant part that "[t]he leadership that preceded me failed to keep this department in step with modern law enforcement.  In particular, they neglected to implement structures of accountability and risk management to safeguard those who put their lives on the line."  At a March 2010 voter forum, Hutchens responded "no" to a question concerning whether she would bring Anderson back to the Department.

PROCEDURAL HISTORY

*Operative Complaint*

In the operative complaint (filed in December 2010) plaintiffs alleged 10 causes of action, but only seven of the causes of action are pertinent on appeal.[8]  The first five causes of action consisted of the five plaintiffs' respective claims that the County violated the Act in connection with their termination.

In the seventh cause of action, plaintiffs Anderson and Davis sought a finding of contempt against Hutchens and Mauk for their alleged failure to comply with an injunction entered in a different case brought under the Act respecting the validity of at-will employee waivers of rights under the Act.  In the eighth cause of action, plaintiffs Cossairt, Bergquist, and Eason asserted breach of contract against the County.

---

[8]  In the sixth cause of action, plaintiffs Anderson and Davis averred they were wrongly terminated in violation of public policy by the County.  The court sustained a demurrer to the sixth cause of action and this ruling is not challenged on appeal.  Plaintiff Bergquist alleged gender discrimination against the County in the ninth and tenth causes of action.  The court granted summary adjudication on the ninth cause of action and Bergquist voluntarily dismissed the tenth cause of action.  Bergquist does not challenge the dismissal of these causes of action on appeal.

11

*Defendants' Motions for Summary Judgment and/or Summary Adjudication*

On June 10, 2011, defendants filed a motion for summary judgment or in the alternative summary adjudication. Defendants asserted that various governmental immunities precluded liability pursuant to all relevant causes of action because the terminations were driven by discretionary budgetary decisions. (See §§ 815.2, 820.2.) Defendants also asserted the breach of contract cause of action was meritless because public employment is held by statute rather than contract. Plaintiffs filed opposition papers designed to defeat the motion filed by defendants.

The court accepted the parties' stipulation to continue the summary judgment hearing to January 13, 2012, and the trial date to February 21, 2012. Plaintiffs filed amended opposition papers on December 22, 2011, and defendants filed their reply papers on January 6, 2012.

On November 4, 2011, defendants filed a *second* motion for summary judgment or summary adjudication, noticed for January 27, 2012. This second motion argued the POBRA claims were entirely without merit because POBRA does not apply to layoffs. Relatedly, defendants argued that plaintiffs needed to take part in the hearings offered by the County to raise their contention that the economic justification for their layoffs was a pretext.

The court ordered the second motion off calendar as not in compliance with Code of Civil Procedure section 437c. The court cited both the impropriety of filing serial summary judgment motions and the untimely nature of the second motion in relation to the trial date.

*Initial Ruling and Invitation for Additional Briefing*

The parties argued the (first) motion on January 13, 2012, and the matter was taken under submission. On January 26, 2012, the court denied the motion with regard to the POBRA causes of action based on the affirmative defenses of governmental

12

and legislative immunity (i.e., the grounds on which the pending motion was filed). But the court also addressed the issues explicitly raised in defendants' *second* motion. Although the court found "triable issues of fact regarding whether the decision to lay-off plaintiffs was a 'dismissal' under § 3303," the court concluded four of the plaintiffs' POBRA claims failed as a matter of law because those four plaintiffs failed to take part in the hearing offered by the County. The court justified its decision to address the so-called merits of the POBRA claims by referencing the evidence in plaintiffs' opposition papers that they had been offered the opportunity to participate in hearings and did not do so. The court excluded Eason from this analysis because there was not yet evidence in the record that Eason "specifically abandoned the hearing." The court also granted summary adjudication as to several other causes of action, including the contempt and breach of contract causes of action.

Plaintiffs filed an ex parte request to continue the trial date, which the court granted by continuing the trial to April 9, 2012. In the course of requesting the continuance, plaintiffs apparently criticized the court's grant of summary adjudication. The court's minute order granting the continuance addressed this criticism: "Plaintiffs' accusation that this Court made some [rogue], unsupportable ruling on a matter not briefed or even triggered by the 'first' [motion] is unfounded. As pointed out in the [order granting summary adjudication], it was *the plaintiffs*, in opposition to that motion, who submitted declarations and exhibits demonstrating defendants' compliance with POBRA by offering a liberty interest hearing. This Court is free to consider all papers submitted — for or against the motion — in assessing the existence of any triable issues. [Citations.] Even facts not contained in the moving party's separate statement can be considered when granting summary judgment. [Citations.] Exercising this discretion is most appropriate when the evidence favoring the moving party is submitted by the party opposing the motion."

13

"So, lest there be any doubt, this Court did not consider the 'second' stricken [motion], and did not rule on the motion in some fantasy vacuum. It ruled on the motion with evidence submitted <u>by the plaintiffs</u>, which just so happened to hurt <u>the plaintiffs</u>."

"That being said, it was evident during oral arguments, and even more so now, that both sides would have submitted additional evidence on the merits of the POBRA claim had time and circumstances permitted. On the one hand, if the 'liberty interest' hearing to be offered by the defendants was indeed illusory, perhaps the spirit, if not the letter, of POBRA was left wanting. On the other hand, if the hearing to be offered would have been satisfactory, and Eason abandoned his option, perhaps even Eason's claim fails. After all, neither side wants to absorb the cost of a trial on matters which could be resolved pre-trial. Both sides have indicated that deposition testimony and declarations exist to shed light on this very discrete issue." The court then invited the parties to submit additional papers (including a 10-page memorandum of points and authorities from plaintiffs, 10-page response from defendants, and six-page reply from plaintiffs) to address the POBRA issue at a new March 2, 2012 hearing.

*Order Granting Summary Adjudication and Final Judgment of Dismissal*

After the parties submitted their additional briefing and accompanying evidentiary material, the court held the scheduled hearing. The court then issued a lengthy order analyzing all of the issues and ultimately granting summary adjudication on the POBRA causes of action (including Eason's, based on newly received evidentiary material), the contempt cause of action, and the breach of contract cause of action.

The court observed as to the POBRA causes of action, "[t]he problem here, which this Court finds to be insurmountable, is that Plaintiffs' election not to proceed with the Department's offer of a 'liberty interest' hearing relegated all the material questions (what would it look like?, what would happen?, could the layoff decision be

14

overturned?) to the world of pure imagination. Obviously, the appropriate course of action would have been to accept the invitation for a 'liberty interest' hearing (whatever that may have entailed) and make the best record possible. Then, either a more formal hearing would have taken place with witnesses and a stenographer, or some 'final' decision would have been made; but either way Plaintiffs could have established with clarity what they were being offered. With clarity on this point being established, Plaintiffs might have then had sufficient grounds to pursue both a POBRA claim *and* a mandamus claim (to give the judicial branch an opportunity to actually overturn the 'layoff' decision). [Citation.] As it presently stands, however, there will never be any competent evidence from which this — or any other court — could faithfully determine whether the 'liberty interest' hearing would have been the functional equivalent of an 'administrative appeal' of the layoff decision. [Citation.] Thus, compliance or noncompliance is forever relegated to the world of speculation and conjecture, as is Plaintiffs' suggestion that presenting evidence would have been futile."

Once Bergquist voluntarily dismissed her surviving cause of action with prejudice, the court entered a judgment of dismissal.

## DISCUSSION

"The standard of review on a motion for summary judgment or summary adjudication is familiar. A defendant meets his or her burden in a summary adjudication motion 'by negating an essential element of the plaintiff's case, or by establishing a complete defense, or by demonstrating the absence of evidence to support the plaintiff's case.' [Citations.] 'We review questions of law as well as orders granting summary adjudication under the de novo standard of review.' [Citation.] Likewise, the interpretation of a statute presents a legal question we review independently." (*Angelica Textile Services, Inc. v. Park* (2013) 220 Cal.App.4th 495, 504.)

15

As an initial matter, plaintiffs assert the court wrongly granted summary adjudication on grounds not raised in the pending motion and based on evidence not submitted in defendants' moving papers. But "[t]he trial court may grant summary judgment on a ground not specifically tendered by the moving party, so long as the opposing party has notice of and an opportunity to respond to that ground." (*Bacon v. Southern Cal. Edison Co.* (1997) 53 Cal.App.4th 854, 860; see *Juge v. County of Sacramento* (1993) 12 Cal.App.4th 59, 63-64, 69-70 [defendant moved for summary judgment based in part on government immunity but court was within its discretion to grant summary judgment on causation element not argued in moving papers].) As set forth above in our discussion of the procedural history of the case, plaintiffs were afforded ample opportunity by the court to respond to the issue relied on by the court in granting summary adjudication on the causes of action under the Act. "To require the trial court to close its eyes to an unmeritorious claim simply because the operative ground entitling the moving party to summary judgment was not specifically tendered by that party would elevate form over substance and would be inconsistent with the purpose of the summary judgment statute." (*Juge*, at p. 69.)

Moreover, evidence submitted by the party opposing summary judgment may provide the basis for granting summary judgment. (See, e.g., *Laabs v. City of Victorville* (2008) 163 Cal.App.4th 1242, 1267-1268, fn. 14; *Villa v. McFerren* (1995) 35 Cal.App.4th 733, 751.) We therefore reject the notion that procedural impropriety occurred and proceed to our de novo review of the court's summary adjudication rulings.

*Court Erred in Summary Adjudication of POBRA Claims*

We turn first to plaintiffs' POBRA claims. Notwithstanding the "layoff" label, plaintiffs claim the County took "punitive action . . . without providing the[m] with an opportunity for administrative appeal." (§ 3304, subd. (b).) Logically, the first question to address is whether the layoffs were in fact "punitive."[9] But the court concluded it could not resolve as a matter of law the question of whether the layoffs were "punitive" and therefore subject to POBRA. As the court observed, "[i]f at day's end it is determined that [these] particular [layoffs were] not pretextual, then the POBRA claims fail ab initio." Defendants do not argue the court was mistaken in finding a triable issue as to the "punitive" nature of the layoffs (at least on the record before it), and we therefore assume for purposes of this appeal that the layoffs were "punitive."

The court granted summary adjudication as to the POBRA claims based on the Department's offer of a liberty interest hearing and plaintiffs' failure to participate in the offered hearing after being notified of their respective terminations. To sum up the pertinent facts: (1) the Department was faced with severe budget cuts in 2009; (2) in selecting employees for layoffs, the Department (acting through Hutchens) was required to utilize a subjective methodology (i.e., evaluate the "needs of the organization," considering employee knowledge, skills, and performance) rather than an objective methodology (e.g., seniority); (3) the Department terminated plaintiffs; (4) the

---

[9] Facially, plaintiffs' terminations were layoffs, proximately caused by severe budgetary cutbacks. According to defendants, these were not disciplinary terminations. This raises the possibility that no "punitive action" was taken against plaintiffs and no "administrative appeal" was therefore necessary under section 3304, subdivision (b). (See *White*, *supra*, 31 Cal.3d at p. 683, fn. 4 [dictum suggesting "the right to an administrative appeal provided by section 3304 . . . does not apply where police officers are laid off as part of a mass reduction in personnel due, for example, to budgetary constraints"]; *Esparza v. County of Los Angeles* (9th Cir. June 12, 2013, No. 11-56523) 2013 U.S. App. Lexis 11817 [POBRA did not entitle peace officers "to continued employment or administrative appeal hearings when" their entire department was eliminated].)

17

Department characterized these employment actions as layoffs necessitated by economic conditions; (5) the Department offered plaintiffs a liberty interest hearing, the specific purpose or scope of which was not clear given the circumstances or the contents of the termination letters; (6) a full, evidentiary hearing before an individual empowered to make factual findings contrary to those of Hutchens was not envisioned by the human resources employees tasked with conducting the hearings; (7) nor did the PSR explicitly set forth a process whereby a laid off employee could obtain an evidentiary hearing based on an accusation of pretext; (8) plaintiffs were instructed to request their hearing within 14 days (i.e., prior to their scheduled date of separation), but it is unclear whether a hearing could have actually proceeded before the plaintiffs' last day of work; (9) plaintiffs (some of whom inquired about the hearing and any possible charges made by the Department) all ultimately declined to participate in the offered hearings; (10) plaintiffs subsequently sued the County for its alleged failure to provide an opportunity for an administrative appeal under section 3304, subdivision (b); and (11) there is evidence before this court of various policy and personality disputes between Hutchens (and/or her leadership team) and each of the plaintiffs.

The process contemplated and offered by the Department, at least according to the e-mail by human resources representative Leys, would have fallen short under both the PSR and POBRA in the context of a termination (or even lesser punishment) based on alleged misconduct or poor performance. In such circumstances, "section 3304 has been held to require that the officer be afforded an evidentiary hearing before a neutral fact finder." (*Giuffre v. Sparks*, *supra*, 76 Cal.App.4th at p. 1329; *id*. at p. 1332 [officer issued written reprimand and punitive transfer to position with less pay as a result of alleged violation of department policy].) "The 'opportunity' for an administrative appeal necessarily implies that such a hearing comport with standards of fair play and due process. Obviously, the 'opportunity' is a sham if the administrative body is biased, predisposed or otherwise prejudiced." (*Doyle v. City of Chino* (1981) 117

18

Cal.App.3d 673, 684.) A section 3304, subdivision (b), evidentiary hearing usually includes "sworn testimony, cross-examination of witnesses, and presentation of argument by the public agency to which the officer could respond," as well as the imposition of the burden of proof on the public agency. (*Los Angeles Police Protective League v. City of Los Angeles* (2002) 102 Cal.App.4th 85, 92-94; cf. *James v. City of Coronado* (2003) 106 Cal.App.4th 905, 912-913 [in case involving placement of written memoranda in employee file pertaining to alleged minor misconduct, court "rejects the notion that as a matter of law every administrative appeal . . . must afford the officer an opportunity to confront and cross-examine witnesses"].) The officer is not required to file "a formal grievance to invoke the right to a full evidentiary hearing." (*Giuffre*, at p. 1332.) Instead, a full evidentiary hearing is "part of the administrative appeal process" that must be followed "to satisfy due process and section 3304." (*Ibid.*)

It is less clear what must be offered to officers under POBRA when they are told they have been laid off for economic reasons. We therefore turn to a discussion of the due process clause and its application to terminated government employees. POBRA rights and constitutional due process rights may be "coextensive" in some instances. (*Baggett v. Gates* (1982) 32 Cal.3d 128, 138, fn. 13; see *Riveros v. City of Los Angeles* (1996) 41 Cal.App.4th 1342, 1359 [POBRA administrative appeal serves "very nearly the same purpose for the hearing mandated by due process requirements"].) Indeed, "when . . . 'the scope of administrative appeal hearing is not prescribed by personnel rules, agency regulations, memoranda of understanding, or customary agency practices, the adequacy of the appeal procedure afforded must be measured according to constitutional due process principles.'" (*James v. City of Coronado*, *supra*, 106 Cal.App.4th at p. 910.)

Our federal and state Constitutions prohibit the deprivation of "life, liberty, or property, without due process of law." (U.S. Const., 5th & 14th Amends., § 1; Cal. Const., art. I, §§ 7, 15.) Some public employment arrangements confer to certain public

19

employees (those deemed permanent or tenured) a "property" interest in their jobs. (See *Skelly v. State Personnel Bd.* (1975) 15 Cal.3d 194, 206-207 (*Skelly*); *Duncan v. Department of Personnel Administration* (2000) 77 Cal.App.4th 1166, 1175 (*Duncan*).) In such cases, "the state must comply with procedural due process requirements before it may deprive its permanent employee of this property interest by punitive action." (*Skelly*, at p. 208.) A so-called *Skelly* pre-termination hearing requires, at a minimum, "notice of the proposed action, the reasons therefor, a copy of the charges and materials upon which the action is based, and the right to respond, either orally or in writing, to the authority initially imposing discipline." (*Id.* at p. 215.) "A tenured public employee is 'entitled to a very limited hearing prior to his termination [for disciplinary reasons], to be followed by a more comprehensive post-termination hearing.'" (*Holmes v. Hallinan* (1998) 68 Cal.App.4th 1523, 1531; *Duncan*, *supra*, 77 Cal.App.4th at p. 1176 ["of course, a public employee is entitled to a full evidentiary hearing after the disciplinary action is imposed"]; but see *Coleman v. Department of Personnel Administration* (1991) 52 Cal.3d 1102, 1119-1123 [employee deemed to resign because he was absent without leave for more than five days was entitled to pre-termination hearing but not post-termination hearing].)[10]

Due process rights even apply to at-will public employees. "A public agency may constitutionally '*employ* persons subject to removal at *its* pleasure.'" (*Lubey v. City and County of San Francisco* (1979) 98 Cal.App.3d 340, 345-346.) But if the probationary or otherwise at-will "employee's job termination, or dismissal, is based on charges of misconduct which 'stigmatize' his reputation, or 'seriously impair' his opportunity to earn a living [citation], or which 'might seriously damage his standing or associations in his community[,]'" the employee is entitled to an opportunity to clear his

---

[10] In their briefs and in oral argument at the trial court, plaintiffs repeatedly assert their right to a *Skelly*-type hearing as provided in the PSR for disciplinary terminations.

or her name.  (*Id*. at p. 346.)  These hearings are often referred to as liberty interest hearings (see, e.g., *Shuer v. County of San Diego* (2004) 117 Cal.App.4th 476, 484), to clarify that the employee does not have a property interest in his or her job.  Instead, the terminated employee has a liberty interest in pursuing future employment without the burden of an unfounded finding of misconduct by a public employer.  "The mere fact of discharge from public employment does not deprive one of a liberty interest."  (*Williams v. Department of Water & Power* (1982) 130 Cal.App.3d 677, 684.)

Due process is an elastic concept and does not mean the same thing in every case.  "The balance of three factors determine what process is constitutionally due: The private interest affected by the official action, the risk of an erroneous deprivation of the interest through the procedure used and the probable value of other or additional procedural safeguards, and the government's interest."  (*Holmes v. Hallinan*, *supra*, 68 Cal.App.4th at p. 1531.)

Applying this three-factor balancing test, courts have concluded that principles of due process apply differently to layoffs.  Pre-termination hearings are not required by due process when it is "undisputed that the layoffs were imposed for budgetary reasons."  (*Alameda County Management Employees Assn. v. Superior Court* (2011) 195 Cal.App.4th 325, 349 (*Alameda County*).)  As to the private interest, "just as a resignation carries no stigma [citation], neither does a layoff."  (*Duncan*, *supra*, 77 Cal.App.4th at p. 1181.)  "[A] layoff is the result of financial exigency, not the actions of a particular employee, good or bad."  (*Ibid*.)  Moreover, "[t]he opportunity to be heard in a reduction in force situation would be meaningless since there are no charges to which to respond."  (*Franks v. Magnolia Hosp.* (N.D. Miss. 1995) 888 F.Supp. 1310, 1315 (*Franks*).)  With regard to the risk of an erroneous deprivation, "[i]n contrast to disciplinary matters, which usually focus on the actions of a single employee, a layoff is based on the 'big picture' — an extensive, time-consuming examination of a department or agency from top to bottom.  [Citation.]  That examination produces data from which

21

the layoff decision is made." (*Duncan*, *supra*, 77 Cal.App.4th at p. 1181.) The use of budget figures and set rules for layoff order (e.g., seniority) also reduces the risk of an erroneous selection of an employee for termination. (*Id*. at pp. 1181-1182.) Finally, the government has a "significant interest in taking quick steps to resolve its economic woes" and it would be unduly burdensome "to conduct pre-layoff hearings for [numerous] employees in the midst of a financial crisis." (*Id*. at pp. 1182-1183.)

Of course, form is not substance, and the "layoff" label does not necessarily reflect the reality of a termination decision. California courts have suggested that a pre-termination hearing may be required when "the layoff is pretextual." (*Duncan*, *supra*, 77 Cal.App.4th at p. 1183, fn. 12; see also *Alameda County*, *supra*, 195 Cal.App.4th at p. 350 ["'a pretext for a personal agenda to terminate [the] employee'"].) But the California cases recognizing this possibility did not involve arguably pretextual layoffs that could have triggered the need for *Skelly* hearing procedures. In *Alameda County*, *supra*, 195 Cal.App.4th 325, it was undisputed that (1) the public employer experienced a budget reduction of approximately $6 million; (2) it selected a group of 72 employees (including plaintiffs) for layoff based on the objective criteria of seniority; and (3) the employer accurately calculated seniority and chose the correct employees for layoffs based on its personnel policies. (*Id*. at p. 334, 351.) In *Duncan*, *supra*, 77 Cal.App.4th 1166, the plaintiff did not even argue his demotion (in lieu of layoff) fell within the pretext exception. (*Id*. at p. 1183, fn. 12.) This concession was made with good reason, as the evidence established that the public employer faced a financial crisis and was forced to layoff numerous employees pursuant to established criteria, including seniority. (*Id*. at pp. 1170-1172.) Although the relevant statute governing layoffs at the Department of Insurance allowed consideration of employee efficiency in specified circumstances, *Duncan* specifically noted that "neither side contends that [employee's] efficiency or job performance influenced the layoff decision." (*Id*. at p. 1182, fn. 10.)

22

An example of a case in which an employee with a property interest in his job contested a layoff as pretextual is *Levine v. City of Alameda* (9th Cir. 2008) 525 F.3d 903. There, Levine responded to his layoff notice by writing "a letter in which he requested a pretermination hearing regarding his lay off. Levine believed that the layoff was a pretext and that he was being terminated because [the city manager] disliked him." (*Id*. at p. 905.) The city refused to provide Levine with a hearing under his union contract procedures, but offered a meeting with human resources "to discuss procedures and retirement benefits." (*Ibid*.) The Ninth Circuit affirmed the district court's grant of summary judgment to Levine, holding Levine's due process rights had been violated. (*Id*. at pp. 905-906.) Levine was entitled to a full evidentiary hearing before a neutral fact finder, not merely a meeting with a human resources employee. (*Ibid*.)

Pretext cases might arise when "either one position or very few positions were eliminated, and all of the terminated employees were the focus of a pretextual elimination." (*Franks*, *supra*, 888 F.Supp. at pp. 1315-1316.) The instant case has some of the hallmarks of a pretext case. It does not involve massive layoffs based on fixed rules such as seniority. A relatively small number of senior employees (six) were terminated in this specific round of layoffs.[11] Moreover, Hutchens was not bound in her selection of employees for termination by seniority rules.

If the trier of fact ultimately determines the layoffs were in fact pretextual, i.e., punitive, we agree with plaintiffs there is a triable issue of fact whether the process offered by the County complied with section 3304, subdivision (b), of POBRA. As previously noted, the PSR layoff procedure lends itself to potentially pretextual layoffs by its empowerment of Hutchens with broad discretion untethered to objective criteria.

---

[11] The record before the court does not include evidence as to how the remainder of the budget shortfall was handled by Hutchens. In their second summary judgment motion, which was stricken by the court and therefore not considered in the court's ruling, defendants presented evidence suggesting the Department laid off 40 employees, not just six employees.

23

After only six employees (including five plaintiffs) were selected for termination, they were then offered liberty interest hearings. As explained above, liberty interest hearings are typically held for probationary employees seeking to clear their names as a result of terminations for cause, not for experienced senior employees who are laid off for the stated reason of budget cuts. The termination letters provided plaintiffs with no guidance as to what liberty interest hearings encompassed and no indication that a *Skelly*-type hearing would be available if plaintiffs were to raise a claim of bad faith against Sheriff Hutchens. Regardless of whether it was the County's intention to do so, the offer of a liberty interest hearing arguably misled plaintiffs (who had a limited amount of time to decide what to do about their terminations) about their rights and how to exercise their rights. Neither the termination letters nor the PSR provided a roadmap to plaintiffs as to how they might contest a pretextual layoff.

The trial court, however, concluded it was plaintiffs' obligation to engage in the process offered by defendants, and to therein make their allegations of pretext. Had they done so, the court reasoned, defendants may well have offered a POBRA compliant hearing. The court held that plaintiffs' failure to pursue a meeting with a human resources representative "forever relegated to the world of speculation and conjecture" whether the Department had complied or not complied with POBRA.

We see the matter somewhat differently. If it is ultimately determined that the layoffs were indeed pretextual, that would mean, at a minimum, that the Department did not advise plaintiffs of the "real" reason for their layoffs. The "real" reason for the layoffs would be known only by the decision maker or makers in the Department, and only they would know whether the layoff was in fact a "dismissal" under POBRA's definition of a "punitive action" (see § 3303), and not a layoff as advertised. With that presumed knowledge, the Department would have been obligated to offer a POBRA compliant evidentiary hearing. Under that scenario, plaintiffs cannot be faulted for not pursuing an ill-defined right to an ill-defined hearing, not in compliance with either the

24

PSR or POBRA. While the court did not use the word "waiver," instead resting its decision on the need for "speculation and conjecture" to determine what would have happened if plaintiffs had pursued the liberty interest hearing, that reasoning essentially predetermines that plaintiffs were at fault for creating the speculation, rather than defendants being at fault for creating the ambiguity. The court's analysis should have led it to conclude there is a triable issue of fact. "Generally, 'waiver' denotes the voluntary relinquishment of a known right. But it can also mean the loss of an opportunity or a right as a result of a party's failure to perform an act it is required to perform, regardless of the party's intent to abandon or relinquish the right." (*Platt Pacific, Inc. v. Andelson* (1993) 6 Cal.4th 307, 315.) Here, assuming pretext, there is no evidence plaintiffs' right to a full evidentiary hearing was known by them, nor were they required to attend a meeting with a human resources representative to discuss unknown issues.

We conclude the trial court erred in granting summary adjudication as to the POBRA causes of action. Again, assuming these layoffs were "punitive" and resolving all triable issues of fact in favor of plaintiffs, the County was obligated to provide plaintiffs with an adequate opportunity for a meaningful administrative appeal. (§ 3304, subd. (b).) We decline to hold that the termination letters and other communications to plaintiffs concerning their terminations met that obligation as a matter of law.

*Court Correctly Granted Summary Adjudication of Contempt Claim*

Buried under a heading in their opening brief on appeal labeled "In General," plaintiffs Anderson and Davis contend the court erred by granting summary adjudication as to their cause of action for contempt of court. As assistant sheriffs, Anderson and Davis had signed "at-will waivers" as a condition of employment. This document states that the signatory agrees he "may be terminated by the Sheriff[] at any

time without notice, cause or rights of appeal or the right to reduce to a lower level position."

In *Jaramillo v. County of Orange* (2011) 200 Cal.App.4th 811 (*Jaramillo*)), this court (affirming the trial court) held that an Orange County Assistant Sheriff (Jaramillo) had not waived his POBRA right to an administrative appeal by signing an at-will employment agreement. (*Id*. at pp. 814-815, 822-825.) The judgment affirmed by this court included a provision which plaintiffs *characterize* as an injunction against the County requiring it to include language in its at-will employment waivers expressly excluding POBRA rights from the waiver.

We decline to decide whether the court erred by dismissing the contempt cause of action. Plaintiffs "forfeited it by failing to brief it properly under a separate heading [citation]; and . . . the [plaintiffs] forfeited it by failing to provide adequate legal analysis [citation]." (*300 DeHaro Streeet Investors v. Department of Housing & Community Development* (2008) 161 Cal.App.4th 1240, 1257; see Cal. Rules of Court, rule 8.204(a)(1)(B) [Each brief must "State each point under a separate heading or subheading summarizing the point, and support each point by argument and, if possible, by citation of authority"].) The judgment is presumed correct, and it is appellant's affirmative burden to show error. (*Walling v. Kimball* (1941) 17 Cal.2d 364, 373.) Plaintiffs have failed to meet this burden. They simply reference the cause of action and baldly assert that the court erred. Accordingly, we affirm the summary adjudication in favor of defendants on the contempt cause of action.[12]

---

[12] During our review of the record, we noted that the supposed September 10, 2009 injunction in the *Jaramillo* case does not directly order the County to do anything. Instead, it orders "Plaintiff's counsel . . . to prepare an injunction directed to the County of Orange as follows: [County is required to exclude POBRA rights from at will employment agreements with peace officers]." Thus it appears counsel was ordered to "prepare an injunction," but we have not found any evidence in the record establishing the existence of an injunctive order directed to the county.

26

*Court Correctly Granted Summary Adjudication of Breach of Contract Claim*

Plaintiffs Cossairt, Bergquist, and Eason conceded in their opposition papers that their cause of action for breach of contract was fatally flawed, citing Supreme Court case law. (See *Miller v. State of California* (1977) 18 Cal.3d 808, 813 ["it is well settled in California that public employment is not held by contract but by statute and that, insofar as the duration of such employment is concerned, no employee has a vested contractual right to continue in employment beyond the time or contrary to the terms and conditions fixed by law"].) These three plaintiffs asked the court to treat the motion as one for judgment on the pleadings as to the breach of contract cause of action, then grant plaintiffs leave to amend the complaint to include a request for a writ of mandamus requiring the County to honor plaintiffs' rights under the "PSR and under *Skelly* . . . for an evidentiary hearing to both contest the dismissal and to have the opportunity to reverse the decision." The court, accepting plaintiffs' concession that the breach of contract action was impermissible under the circumstances, instead granted the motion for summary adjudication and denied plaintiffs' request to amend the complaint as a result of "unjustified delay and presumed prejudice to Defendants."

In their appellate briefs, plaintiffs again concede they pleaded the wrong cause of action but claim (in a conclusory fashion) their allegations should allow a mandamus action. Plaintiffs do not actually argue or cite authority on appeal for the proposition that the court erred in acting as it did, however. We treat this contention as forfeited. (See *300 DeHaro Street Investors v. Department of Housing & Community Development*, *supra*, 161 Cal.App.4th at p. 1257.)

DISPOSITION

The judgment of dismissal is reversed. The order granting defendants' motion for summary adjudication is reversed with regard to the POBRA causes of action

27

(first through fifth causes of action), and the court is directed to enter a new order denying the motion on those causes of action.  The order granting defendants' motion for summary adjudication on the causes of action for contempt and breach of contract (seventh and eighth causes of action) is affirmed.  Plaintiffs shall recover their costs on appeal.


                                                    IKOLA, J.

WE CONCUR:


O'LEARY, P. J.


MOORE, J.